IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

| | | |
|---|---|---|
| In re Grand Jury Subpoena,<br><br>MATTHEW COLE,<br>Subpoenaed Party | ) | Case No. 4:26dm1<br>4:25G1/NN25-2386<br><br>**Filed Under Seal** |

**GOVERNMENT'S RESPONSE TO MATTHEW COLE'S MOTION TO QUASH**

## I. Introduction

Matthew Cole may well be an excellent national security reporter, with sincerely and strongly held beliefs about the value of his reporting to "our republic." ECF No. 2, Ex. C, at 1. However, in our republic, a reporter—like any other citizen—must appear for testimony before a grand jury when served with a subpoena. Grand juries, no less than the guarantee of a free press, are an essential component of the nation's governing framework, and their approval is constitutionally required for the initiation of serious federal criminal charges. Reporters enjoy no special privilege [redacted] to the grand jury, and neither the First Amendment nor any principle of the common law empowers reporters to withhold or conceal evidence of a crime when called to testify.

Like any other citizen, a reporter may also seek protection from the courts to prevent harassing or otherwise improper use of the grand jury by the government, but Cole's objections in that regard here are meritless. Cole can provide no convincing evidence that he is being singled out because his reporting or his viewpoint are unpopular with government officials, nor can he plausibly allege that the subpoena here seeking his testimony about possible criminal conduct engaged in by others is actually a part of some general campaign to suppress press

freedoms. He cannot do these things because the government's purpose here is not to harass Cole, nor is it to affect his reporting. Instead, the government, with the express authorization of the Attorney General, served Cole with a subpoena for his testimony for one purpose and one purpose only: to obtain his testimony [redacted]

[redacted] By Cole's own description, his reporting disclosed publicly "a top secret mission so complex and consequential" that involved "putting American commandos" on foreign soil, which, "if detected, not only could sink negotiations but also could lead to a hostage crisis or an escalating conflict with a nuclear-armed foe." ECF No. 2, Ex. B, at 1. Cole wrote that this "operation has never been publicly acknowledged, or even hinted at, by the United States" and stated that "[t]he details remain classified and are being reported here for the first time." *Id.* at 2. In a Substack post, Cole disclosed that he "learned about the mission . . . in 2023 from a trusted and vetted source." ECF No. 2, Ex. D, at 1. "The circumstances of the disclosure—one of the most highly classified military missions in a generation" led Cole to sit on the story for eight months to avoid exposing his source before confirming it through other interviews. *Id.* at 1-2 (emphasis added).

Several statutes enacted by Congress criminalize the unauthorized disclosure of classified or national defense information by those entrusted with the nation's secrets.[1] Disclosures to the press—even if to "a longtime investigative journalist," ECF No. 2, at 1—are not exempted. [redacted]

---

1. *See, e.g.*, 18 U.S.C § 793(d) (ten-year felony for willful unauthorized disclosure of national defense information); 18 U.S.C. § 1924 (five-year felony for unauthorized removal or retention of classified documents).

[redacted] Just like one of the reporters whose claims of a newsgathering privilege were squarely rejected by the Supreme Court in *Branzburg v. Hayes*, "if what [Cole] wrote was true, he ha[s] direct information to provide the grand jury concerning the commission of serious crimes." 408 U.S. 665, 708–09 (1972). Gathering the full factual picture of this likely criminality, and assessing whether any charges are warranted, is a legitimate law enforcement purpose for the government to pursue before the grand jury. The need for Cole's testimony in that inquiry is what this case is about, and nothing else. As Cole has no privilege to assert, and no other basis to avoid testifying about a matter relevant to the grand jury's inquiry, the Court should deny his motion to quash.

## II. Factual and Procedural Background

On September 5, 2025, a news article was published in *The New York Times*, listing freelancer Cole and a *Times* correspondent as its authors, and three other reporters as contributors. ECF No. 2, Ex. B, at 1, 15 ("Article"). The Article described "a top secret mission so complex and consequential" that involved "putting American commandos on [foreign] soil – a move that, if detected, not only could sink negotiations but also could lead to a hostage crisis or an escalating conflict with a nuclear-armed foe." *Id.* at 1. Cole and his co-author wrote that this "operation has never been publicly acknowledged, or even hinted at," and that "[t]he details remain classified and are being reported here for the first time." *Id.* at 2. Regarding sources, the Article stated: "All of them spoke on condition of anonymity because of the mission's classified status." *Id.*

Also on September 5, 2025, Cole posted on the internet publishing platform Substack regarding his decision to publish the Article in the *Times* and with the aid of its reporting staff.

ECF No. 2, Ex. D ("Substack Post"). In the Substack Post, Cole elaborated on the sourcing of the Article, and disclosed that he "learned about the mission . . . in 2023 from a trusted and vetted source." *Id.* at 1. "The circumstances of the disclosure—one of the most highly classified military missions in a generation" led Cole to sit on the story for eight months to avoid exposing his source before confirming it through other interviews. *Id.* at 1-2.

In the fall of 2025, following the Article's publication, an investigation into possible violations of criminal statutes punishing the unauthorized disclosure of national defense information was opened by three components of the Justice Department: the Federal Bureau of Investigation, the National Security Division, and the United States Attorney's Office for the Eastern District of Virginia. As part of that process, [redacted]

On February 6, 2026, as required by Department policy governing investigative process directed to or regarding members of the news media, prosecutors in the National Security Division sought the approval of the Attorney General of the United States for the issuance of a grand jury subpoena for Cole's testimony in this matter. That approval was granted by the Attorney General on or about February 8, 2025. FBI agents served Cole with the subpoena on February 9, 2026, and his counsel contacted the government shortly thereafter.

In initial discussions in February 2026, those lawyers (different from Cole's current counsel) were informed that Cole was a witness [redacted]. Cole's counsel also inquired about whether the Attorney General had approved the subpoena, and government counsel confirmed as much.

Once Cole's current lawyers were engaged, the government and his counsel discussed the possibility of a voluntary interview of Cole under a proffer agreement. The government also agreed to postpone Cole's appearance before the grand jury (originally set for March 9, 2026) to allow counsel's discussions about the logistics of an interview to continue.

In April 2026, negotiations over the interview of Cole stalled when his counsel expressed surprise that the [redacted]. The government then informed Cole's attorneys that it would subpoena his appearance before the grand jury during the week of June 8-9, 2026. Government counsel reiterated on May 26, 2026, that information from Cole was necessary to moving investigation forward, and that his testimony before the grand jury remained scheduled for June, but that the government remained open to resolutions short of testimony. The government suggested that these alternatives could include a voluntary interview—or even an attorney proffer—regarding [redacted].

In response to Cole's concerns about the breadth of this request, government counsel suggested a willingness to narrow its focus [redacted]. Cole's attorneys expressed that [redacted], and after seeking and receiving assurances that the government would not attempt to enforce compliance with the subpoena during litigation over a motion to quash, Cole filed the instant motion on June 5, 2026. *See* ECF Nos. 1-2.

## III. Argument

Cole, like any other citizen, is obliged to comply with a valid grand jury subpoena for his testimony. First, he has no special privilege or status as a reporter to refuse that testimony. Second, his testimony is legitimately sought for a bona fide criminal matter because it is relevant and material to the grand jury's inquiry [redacted]

[redacted]. Third, the subpoena to him was issued in good faith, not for any improper purpose, and in compliance with Department policy. The motion to quash should therefore be denied.

### *A. Reporters Enjoy No Special Privilege to Avoid Grand Jury Testimony Under the First Amendment or the Common Law.*

"The investigative power of the grand jury is necessarily broad if its public responsibility is to be adequately discharged." *Branzburg*, 408 U.S. at 700. In the context of a grand jury subpoena, "the longstanding principle that the public has a right to each person's evidence is particularly strong." *In re Grand Jury Subpoena*, 646 F.3d 159, 164 (4th Cir. 2011) (quoting *In re Grand Jury Proceedings #5 Empaneled Jan. 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005)).

Though Cole seeks to avoid grand jury testimony based on claimed First Amendment concerns, and pleads that the Court ought to recognize a [redacted] privilege, the law from the Supreme Court on this issue is crystal clear, and has been since at least 1972: "there is no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation . . . ." *Branzburg*, 408 U.S. at 708.

The Supreme Court has consistently adhered to the holding and reasoning of *Branzburg*. *See, e.g., Citizens United v. FEC*, 558 U.S. 310, 352 (2010) ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers"); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) (explaining that "the First Amendment [does not] relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source"); *Univ. of Pa. v. EEOC*, 493 U.S. 182, 201 (1990) (explaining that *Branzburg* "rejected the notion that under the First Amendment a reporter could not be required to appear or to testify as to information obtained in

confidence without a special showing that the reporter's testimony was necessary"). In short, it remains "the duty of a citizen, whether reporter or informer, to respond to [a] grand jury subpoena and answer relevant questions put to him." *Branzburg*, 408 U.S at 697.

The Fourth Circuit, in ruling on a reporter's challenge to a trial subpoena, more recently found the holding of *Branzburg* to be no less valid, and no less clear:

> There is no First Amendment testimonial privilege, absolute or qualified, that protects a reporter from being compelled to testify by the prosecution or the defense in criminal proceedings about criminal conduct that the reporter personally witnessed or participated in, absent a showing of bad faith, harassment, or other such non-legitimate motive, even though the reporter promised confidentiality to his source.

*United States v. Sterling*, 724 F.3d 482, 492 (4th Cir. 2013). Moreover, "so long as the subpoena is issued in good faith and is based on a legitimate need of law enforcement, the government need not make any special showing to obtain evidence of criminal conduct from a reporter in a criminal proceeding." *Id.* at 496. Thus, a "reporter must appear and give testimony just as every other citizen must." *Id.* *See also In re Shain*, 978 F.2d 850, 852 (4th Cir. 1992) ("[A]bsent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution.").

Cole ignores these clear statements of the law and quotes cases from different First Amendment contexts praising the importance of a free press. *See* ECF No. 2, at 9-10. The government has no quarrel with these statements—a free press, and the rights of all citizens to free expression, are indeed bedrock constitutional principles. But Cole's right to speak and publish as he wishes is not at issue here; instead, the issue is the power of the grand jury to [redacted]. The grand jury is also a crucial institution of our criminal justice system, and its foundation is no less constitutional than a free press: "Grand jury proceedings are constitutionally mandated [by the

Fifth Amendment] for the institution of federal criminal prosecutions for capital or other serious crimes, and 'its constitutional prerogatives are rooted in long centuries of Anglo-American history.'" *Branzburg*, 408 U.S. at 687 (quoting *Hannah v. Larche*, 363 U.S. 420, 489-90 (1960). (Frankfurter, J., concurring in result)).[2] As such, the grand jury is permitted to impose an "incidental burden on the freedom of the press" to obtain a reporter's testimony "relevant" to the matters before it. *See In re Shain*, 978 F.2d at 852.

Cole also argues that the Court should recognize a common law reporter's privilege under Federal Rule of Evidence 501, separate and apart from the First Amendment. ECF No. 2, at 25-29. That claim is easily dispatched by *Branzburg*, which cited the "consistent[] refus[al]" of courts to recognize any common law newsman's privilege as support for its decision declining to recognize such a privilege under the First Amendment. 408 U.S. at 685. *Sterling*, for its part, explicitly declined to import into Rule 501 a common law reporter's privilege. 724 F.2d at 499-505. *See also In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1154 (D.C. Cir. 2006) (Sentelle, J., concurring) (finding it "indisputable that the High Court rejected a common law privilege in the same breath as its rejection of such a privilege based on the First Amendment").

---

2. The Court should also reject Cole's argument that the subpoena infringes on his right of free association. See ECF No. 2, at 23-25. None of the cases he cites from that context—which typically involve state-compelled disclosures of the membership rolls of political groups—has anything to do with reporters and their "association" with sources who criminally disclose classified information. *See, e.g., Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 614 (2021) (invalidating under First Amendment strict scrutiny a California regulation that "casts a dragnet for sensitive donor information from tens of thousands of charities each year, even though that information will become relevant in only a small number of cases involving filed complaints"). Cole is free to associate with whomever he chooses. However, [redacted] is a legitimate government interest narrowly served by the subpoena. Nothing in the cases cited by Cole suggests otherwise.

In *Sterling*, the Fourth Circuit provided numerous reasons for its decision not to find a newsman's privilege in the common law, but prominent among them was the appeals court's recognition that unlike with recognized common law privileges (such as the attorney-client privilege) that "promote the public's interest in full and frank communications between persons in special relationships by protecting the confidentiality of their private communications," the reporter "does not seek to protect from public disclosure the 'confidential communications' made to him" but instead "*published* information conveyed to him by his source or sources. His primary goal is to protect the *identity* of the person or persons who communicated with him because their communications violated federal, criminal laws." 724 F.3d at 502 (emphasis in original). This situation—[redacted]—"shares little in common with the privileges historically recognized in the common law and developed under Rule 501." *Id.* at 503. In light of the unequivocal controlling precedent on this issue, and the reluctance of courts to recognize new privileges undermining the principle that "there is a general duty to give what testimony one is capable of giving," *id.* at 502 (citations and quotations omitted), this Court should decline to create a reporter's privilege at common law through Rule 501.

*B. There is a Legitimate Law Enforcement Need for Cole's Testimony Because It Is Relevant and Material to the Matter Before the Grand Jury.*

The need for Cole's grand jury testimony is straightforward: by his own account, the Article was the first public disclosure of the existence of and details regarding "one of the most highly classified military missions in a generation." ECF No. 2, Ex. B, at 1-2. Again, according to Cole, as published in the *Times* Article:

- The mission was "top secret" and conducted on foreign soil, with the potential to affect foreign negotiations and trigger a "hostage crisis or an escalating conflict with a nuclear-armed foe." *Id.* at 1.

- The mission "has never been publicly acknowledged, or even hinted at, by the United States . . . ." *Id.* at 2.
- "The details remain classified and are being reported here for the first time." *Id.*
- "[T]wo dozen people, including civilian government officials, members of the first Trump administration and current and former military personnel with knowledge of the mission" were interviewed. *Id.*
- All sources "spoke on the condition of anonymity because of the mission's classified status." *Id.*
- "The *New York Times* proceeds cautiously when reporting on classified military operations" and thus "withheld some sensitive information" from publication. *Id.* at 3.

Coincident with the publication of the Article, Cole also wrote the Substack Post, which among other things explained his reporting, [redacted]:

- Cole first learned of the operation described in the Article "in 2023 from a trusted and vetted source. The circumstances of the disclosure—one of the most highly classified military missions in a generation"—led Cole to avoid gathering further information for months to "protect my source." ECF No. 2, Ex. D, at 1-2.
- Cole "began making calls [to other sources] about the operation in mid-2024." *Id.* at 2.
- Cole knew his reporting concerned a "massive international story . . . and the risks surrounding disclosure were high." *Id.*

In view of criminal laws punishing the unauthorized disclosure of national defense

information and classified material, the Article and the Substack Post standing by themselves provide a basis [redacted] Most relevant to the circumstances here, it is a ten-year felony for a person having lawful possession of "information relating to the national defense which information the possessor has reason to believe could be used to the injury or the United Sates or to the advantage of any foreign nation" to communicate that information "to any person not entitled to receive it . . . ." 18 U.S.C. § 793(d).

Cole argues that *Branzburg* and *Sterling* only authorize "narrowly drawn" subpoenas to reporters seeking "discrete information essential to prosecution," ECF No. 2, at 11 (capitalization removed), or "isolated and concrete information that the government needed to complete an investigation," *id.* at 12. Not so: the Supreme Court has been clear that the testimony sought must only be "relevant and material" to the criminal inquiry. *Branzburg*, 408 U.S. at 708 ("[T]here is no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation . . . ."). Cole also suggests that the government can only call a reporter to testify after it has "exhausted multiple alternative avenues of investigation," ECF No. 2, at 12—but that is just a qualified privilege argument in disguise, and a requirement not found in either *Branzburg* or *Sterling*. While *Sterling* involved a trial subpoena, and the appeals court took some comfort in the fact that the reporter's testimony was "the only direct testimony" of an illegal disclosure by the defendant, 724 F.3d at 507, the appeals court did not require any heightened showing of need by the government.[3] Any reading of

3. Furthermore, even assuming Cole's position about strict necessity were adopted as the law, the subpoena would still be valid under his faulty reading of *Sterling*: [redacted]

*Sterling* to the contrary would have to ignore, among other things, that court's very clear pronouncement of the law: "The reporter must appear and give testimony just as every other citizen must." *Id.* at 496.

*Branzburg* provides even less support for Cole's "essentialness" standard. That case involved challenges by multiple reporters to grand jury subpoenas issued at an early investigative stage. *See* 408 U.S. at 667-79. To take but one example, petitioner Branzburg, a reporter in Kentucky, published an article "describing in detail his observations of" drug production by two young hashish dealers, and was "shortly subpoenaed by the Jefferson County grand jury . . . ." *Id.* at 667-68. The Court's recitation of the facts involved in other reporters' cases before it makes clear that each was subpoenaed to testify at a similarly early stage of the grand jury's inquiry. *See id.* at 672-73 (Massachusetts reporter called to testify "two months" after observing and reporting on illegal activity); 675-76 (*New York Times* reporter in California called to testify before and provide documents to grand jury investigating "possible violations of a number of criminal statutes" by Black Panther Party members). Moreover, in rejecting a qualified reporter's privilege,[4] the Court was skeptical of "embroil[ing]" the lower courts "in preliminary factual and legal determinations with respect to whether the proper predicate had been laid for

---

4. Cole suggests in a footnote that Justice Powell's concurrence in *Branzburg* created a qualified privilege standard, and he cites several circuit decisions that appear to have adopted this view of the Supreme Court's holding. ECF No. 2, at 13 n.19. For a variety of reasons, this view *Branzburg* is misguided, among them that Justice Powell joined fully in the opinion of the Court authored by Justice White. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1148 (D.C. Cir. 2006) ("Justice Powell's concurring opinion was not the opinion of a justice who refused to join the majority. He joined the majority by its terms, rejecting none of Justice White's reasoning on behalf of the majority. [. . .] Justice White's opinion is not a plurality opinion of four justices joined by a separate Justice Powell to create a majority, it is the opinion of the majority of the Court. As such it is authoritative precedent. It says what it says. It rejects the privilege asserted by appellants.").

the reporter's appearance" such that a qualified privilege was overcome:

> Is there probable cause to believe a crime has been committed? Is it likely that the reporter has useful information gained in confidence? Could the grand jury obtain the information elsewhere? Is the official interest sufficient to outweigh the claimed privilege? Thus, in the end, by considering whether enforcement of a particular law served a 'compelling' governmental interest, the courts would be inextricably involved in distinguishing between the value of enforcing different criminal laws.

408 U.S. at 705–06.

Nor is the subpoena for Cole's testimony an effort to "annex the news media as an investigative arm of the government." *See* ECF No. 2, at 14-15 (quoting *Branzburg*, 408 U.S. at 709-10 (Powell, J., concurring)). Cole objects that his testimony might [redacted]

---

5. As Cole implicitly acknowledges, the government seeks his testimony [redacted]. The government does not seek his testimony, for example, regarding reporting on the President's son-in-law or any other topic, as has never suggested as much to Cole's counsel across months of discussion about the subpoena.

[redacted].

This "relevant and material" nature of the information sought through Cole's testimony is all that is required to establish a "legitimate need of law enforcement." Indeed, if the Commonwealth of Kentucky could obtain testimony from a reporter about the illegal activity of hashish dealers, *Branzburg*, 408 U.S. at 692, then certainly there is no less a legitimate federal law enforcement interest in asking a reporter about [redacted]

Cole, again seeking to have the Court adopt *sub silentio* a qualified immunity standard, argues that "legitimate need of law enforcement" is by itself insufficient to justify a reporter subpoena under the First Amendment. ECF No. 2, at 16. He claims that such "legitimate" demands "would not be limited to circumstances involving the military or other purported

national security matters" and further that:

> Prosecutors could serve subpoenas on every reporter investigating any number of topics—public corruption, bribery, foreign entanglements, government litigation conduct, or misuse of government funds—to name just a few—thereby chilling the initiation of investigative reporting on issues of profound public importance.

*Id.* The Court should be skeptical of Cole's claims about the supposed "chilling effects" of subpoenas to reporters who might report on these or other areas of criminal activity. Since *Branzburg*, and at least once a generation thereafter in prominent circuit court cases, reporters whose testimony is sought in criminal matters, backed by *amici curiae* from the press establishment, have claimed that newsgathering will be chilled, and the First Amendment thus undermined, if a reporter's privilege is not recognized by the courts. Just as the Supreme Court stated more than fifty years ago, there is no basis for such a conclusion:

> We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press.

*Branzburg*, 408 U.S. at 698–99; *see also Sterling*, 724 F.3d at 503 ("We are also mindful that the Court in *Branzburg* considered and was unpersuaded by a virtually identical argument that a reporter's privilege was necessary to prevent a chilling effect on newsgathering.").

And as a practical matter, as discussed further below, Department of Justice policy strictly limits the circumstances in which prosecutors may issue subpoenas to reporters, and such subpoenas remain rare. As that policy itself reflects, the elected and appointed officials who supervise prosecutors are also mindful that even legally sound investigatory steps may prove

unpopular, or force unnecessary confrontations with recalcitrant witnesses. But those practical difficulties with press subpoenas, along with the sensitivities shown to members of the press by policy, are not a basis to quash a subpoena in a legitimate criminal case like this one.

*C. The Subpoena Was Issued in Good Faith and In Compliance with Applicable Department Policy Governing News Media Subpoenas.*

The Supreme Court in *Branzburg* recognized that "news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment." 408 U.S. at 707. "Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification." *Id.*

Despite Cole's protestations to the contrary, the subpoena has no purpose or intention to harass him or to "disrupt" [redacted] The goal is not to suppress news coverage by Cole—that coverage has already happened, and Cole's publication is not a basis for his own criminal liability—but to [redacted] And any "disruption" of Cole's relationships [redacted] is an "incidental burden" serving those legitimate purposes. *See In re Shain*, 978 F.2d at 852.

Cole argues that the subpoena to him violates the Justice Department's own policy, and thus illegitimate. He is wrong. Counsel for the government (predecessors to the undersigned

who were then assigned to the case but who are no longer at the Department) sought and received approval to seek Cole's testimony by subpoena from the Attorney General of the United States, as required by Department policy.[6]

Generally speaking, federal prosecutors are bound by policy to seek the approval of the Attorney General to issue a testimonial subpoena to a member of the news media. 28 C.F.R. § 50.10(c)(1). Department employees may be disciplined for failing to abide by this policy. *Id.* § 50.10(h) ("Failure to obtain the prior approval of the Attorney General, as required by this section, may constitute grounds for an administrative reprimand or other appropriate disciplinary action."). By its own terms, however, the policy explicitly "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." *Id.* § 50.10(i). Instead, the policy's manifest purpose is to (greatly) cabin the discretion of the Department's thousands of line prosecutors—who ordinarily have wide latitude in evidence gathering matters—to obtain information from or about members of the press by requiring the Attorney General's approval for such actions. That requirement was followed here, and Cole's assertions that the Department ignored or improperly evaluated the various considerations outlined in the policy in its internal, privileged deliberations, are of no relevance.

Cole's factual submissions likewise offer no basis to conclude that the subpoena is calculated to harass or intimidate him. He relates that the FBI attempted to serve him with a subpoena in February 2025 by visiting his home, and that he was later served by email. ECF No.

---

6. As noted above, Cole's counsel inquired about and were informed of the Attorney General's approval for the subpoena shortly after Cole was served.

2, Ex. C, at 3. An attempt to serve a grand jury witness in this fashion is in no way unusual, and Cole's declaration does not contend that the agents were rude, aggressive, or otherwise behaved improperly in their interactions with him or his wife. And as Cole's filings indicate, there is no doubt about the reasons for the government's interest in Cole's testimony: "the article Mr. Cole co-authored that was published in the *New York Times* on September 5, 2026, and the Substack article by Mr. Cole of the same date []." *Id.* at 2. [redacted] Despite Cole's intimations to the contrary, his testimony is not sought regarding any of his reporting on any other topics, such as a third party unrelated to this case. *See* ECF No. 2, Ex. C, at 3-4. Indeed, Cole's reporting on the third party named in his declaration appears wholly irrelevant to the criminal inquiry pending before the grand jury, and was unknown to the undersigned government counsel until disclosed by Cole in his filings.

It is likewise of no moment that the government has been unwilling to share certain details about the investigation with counsel for Cole, such as "whether the subpoena represents the culmination of a pending investigation or the launch of a new one." ECF No. 2, Ex. E, at 2. Cole is a mere witness in the case, and witness's obligation to comply with a grand jury subpoena does not depend on his understanding of the scope or timing of the underlying investigation. The government has a legitimate interest in preserving the secrecy of its own and the grand jury's investigation, including under Rule 6(e). As his filing indicates, however, Cole is not confused about the matter on which his testimony is sought, [redacted]

Cole's recitation of public expressions of anger by government officials directed at other

journalists, the *Times*, or about the press generally, do not demonstrate that the subpoena to him was issued in bad faith. ECF No. 2, at 19-20. What is absent from the record—and indeed from the news articles that provide atmospherics for Cole's filing—is any statement by any public official that shows specific animus towards Cole.

As further indicated in Cole's filings, his counsel has engaged in discussion with government counsel over several months regarding his appearance. *See* ECF No. 2, Ex. E. Cole's counsel were invited to raise any concerns about the subpoena to supervisors of the line prosecutors. In the many months since Cole received the subpoena, his counsel have sought to negotiate a resolution of the matter that would obviate the need for Cole to testify, which efforts the government welcomed in good faith because of its interest in the facts Cole might provide. As part of those good faith efforts, and to avoid litigation, the government suggested that it would even accept an attorney proffer of information [redacted]. Cole elected to decline that invitation and instead filed the motion to quash. These are hardly circumstances that show bad faith or harassment on the part of the government.

In the end, Cole's effort to quash the subpoena on the basis of conjectured improprieties and ulterior motives is nothing more than an attempt to unnecessarily "saddle [the] grand jury with minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *United States v. R. Enters., Inc.*, 498 U.S. 292, 298-99, 301 (1991) (motion to quash subpoena must be denied except when "there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation"). The Court should reject that effort, and order him to testify.

## CONCLUSION

For the reasons above, the United States asks the Court to deny Matthew Cole's motion to quash the grand jury subpoena for his testimony.

Date: June 29, 2026

Respectfully submitted,

TODD W. BLANCHE
ACTING ATTORNEY GENERAL

By: /s/ Brian J. Samuels
Brian J. Samuels
Peter Osyf
Assistant United States Attorneys

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL
National Security Division

By: /s/ Joshua T. Ferrentino
Joshua T. Ferrentino
Trial Attorney
Counterintelligence and Export Control Section