**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| In re: Grand Jury Subpoena,<br>MATTHEW COLE,<br>Subpoenaed Party. | Case No. 4:26dml<br>4:25G1/NN25-2386 |

# MEMORANDUM OF LAW IN FURTHER SUPPORT OF MATTHEW COLE'S MOTION TO QUASH

## INTRODUCTION

The Government's opposition serves only to demonstrate why judicial intervention is necessary. By its own account, the Government wants this Court to endorse the wholesale disclosure of newsgathering activity through a sweeping, speculative, and premature subpoena that is fundamentally different from the type of process other courts have permitted. Where previous subpoenas sought specific and isolated facts to prove established criminality, this subpoena takes aim at investigative journalism itself; [redacted], the government asserts, it is "plausible" that this dragnet might suggest avenues that "[redacted]." *See* Gov't's Opp'n to Mot. to Quash at 3, 13–14, ECF No. 8 (emphasis omitted).

The Government professes sensitivity to the First Amendment, but the power it claims in this case threatens grave damage, and no amount of lip service in sealed briefing to the importance of a free press can counter the loud, public, and alarming drumbeat of attacks on media sources that has been the defining hallmark of this Administration and Department of Justice ("DOJ" or the "Department"). That drumbeat has escalated since this motion was filed. Just days ago, DOJ sent federal agents to the homes of *New York Times* reporters to serve grand jury subpoenas about an article, published just 48 hours before, that reported on concerns surrounding the airplane that President Trump accepted as a gift from Qatar.[1] The FBI Director, who unsuccessfully sued the *Times* for libel over coverage of his actions in the first Trump Administration, personally

[1] Michael M. Grynbaum, *Times Journalists Subpoenaed as Trump Escalates Pressure on Media*, N.Y. TIMES (July 11, 2026), https://www.nytimes.com/2026/07/11/business/media/new-york-times-trump-subpoenas.html.

spearheaded the effort from the White House in collaboration with senior political officials and in response to the President's anger over the reporting.[2]

Nothing about this record supports the Government's appeal to trust in prosecutorial self-restraint; to the contrary, it vividly illustrates that the presumption of regularity no longer holds sway in this aspect of the Department's work. This Court should discard any such deference and instead recognize the realities that, in combination with the subpoena's overbreadth and prematurity, render the Government's demand in this case fundamentally inconsistent with the law.

Those realities begin with the nature of Mr. Cole's reporting. For decades, he has shone a light on failures of accountability, efforts to evade congressional oversight, and other official malfeasance in the critical context of national security and executive authority. Decl. of Matthew Cole at ¶ 1–2, ECF No. 2-3. The investigative work that the [redacted]—a product of whistleblower accounts driven by concerns about a dangerous pattern of secrecy—exposed the violation by the first Trump Administration of laws requiring notification of Congress about an extremely risky operation that resulted in the death of unarmed civilians and could have sparked a broader conflict with a nuclear-armed nation. ECF No. 2-2. And the reporting did so less than a year into the second Trump Administration, when the President had launched unilateral

[2] Devlin Barrett, Glenn Thrush & Maggie Haberman, *White House Directed Patel to Oversee Investigation Involving Times Reporting*, N.Y. Times (July 11, 2026), https://www.nytimes.com/2026/07/11/us/politics/white-house-patel-investigation-times.html.

missile strikes against boats in the Caribbean,[3] on the eve of a secret military operation against the President of Venezuela,[4] and months ahead of a full-scale war against Iran.[5]

The Administration evidently deemed the reporting embarrassing; when asked about the article, the President falsely denied any knowledge of an operation he had personally approved. ECF No. 2-2, at 2.[6] In response, the Departments of Justice and Defense launched an effort to force Mr. Cole to [redacted] even though the Government admits that it has not determined [redacted]. ECF No. 8, at 13–14. If there is any previous example of such an intrusive and indiscriminate attack on investigative journalism, the Government has not offered it.

Reflecting the disorder throughout the Department and in this District, the matter has involved a rotating set of attorneys, including the former "Media Leaks Coordinator" in the National Security Division who resigned around the time DOJ reportedly withdrew subpoenas to

---

[3] Ben Finley, Konstantin Toropin & Regina Garcia Cano, *Boat Strikes, Warships and Venezuela Rhetoric Raise Questions About Trump's Goals*, ASSOCIATED PRESS (Sept. 26, 2025), https://apnews.com/article/trump-venezuela-boat-strikes-warships-6ffd9e6f4eb738048c816c6d8257a6ef.

[4] Julian E. Barnes, Tyler Pager & Eric Schmitt, *Inside 'Operation Absolute Resolve,' the U.S. Effort to Capture Maduro*, N.Y. TIMES (Jan. 3, 2026), https://www.nytimes.com/2026/01/03/us/politics/trump-capture-maduro-venezuela.html.

[5] Lara Seligman, Shelby Holliday & Alexander Ward, *U.S and Iran Exchange Strikes in Latest Threat to Fragile Ceasefire*, WALL STREET JOURNAL (July 7, 2026) https://www.wsj.com/world/middle-east/u-s-revokes-waiver-allowing-sale-of-iranian-oil-b6eb5620.

[6] Ivan Pereira, *Trump Says He Doesn't Know "Anything" About Reported Violent, Failed SEAL Team 6 Mission in North Korea,* ABC NEWS (Sept. 5, 2025, 7:11 PM), https://abcnews.com/Politics/trump-reported-violent-failed-seal-team-6-mission/story?id=125300720.

the *Washington Post* and *Wall Street Journal.*[7] The newly assigned line attorneys insist that their own personal motivation is the protection of national security. *See generally* ECF No. 8. But DOJ has now disclosed that the subpoena was approved in just two days by the former Attorney General, ECF No. 8, at 4, who rescinded previous regulations restricting reporter subpoenas on the ground that they aided "media allies" who "undermine[d] President Trump's policies."[8] The first name on the Government's brief is the Acting Attorney General, who has described the *New York Times* as a "purported news outlet" that produces "disgusting journalism" and has warned reporters that they should expect subpoenas when they write about national security.[9] The FBI Director, who last week oversaw the issuance of subpoenas to *Times* reporters from the White House, has personally sued the *Times* and declared the "mainstream media" the "most powerful enemy that the United States has ever seen."[10] The Secretary of Defense, who leads the client agency in this investigation, has decried the "legacy Trump-hating press," compared reporters to the biblical

---

7 Alanna Durkin Richer & Eric Tucker, *Justice Department Withdraws Subpoenas That Sought Reporters' Grand Jury Testimony, Sources Say*, ASSOCIATED PRESS (June 23, 2026), https://apnews.com/article/justice-department-fbi-media-c4fcb4d718d8313940f7c19a8f3f8e26; Menno Goedman, LinkedIn, https://www.linkedin.com/posts/menno-goedman-2846215_last-week-i-left-the-department-of-justice-activity-7472278115457642497-hh_Z (last visited July 11, 2026).

8 Memorandum from Pamela Bondi, Att'y Gen., U.S. Dep't of Just., to All Dep't Emps., *Updated Policy Regarding Obtaining Information From, or Records of, Members of the News Media* (Apr. 25, 2025), https://www.justice.gov/oip/media/1399681/dl?inline.

9 Todd Blanche (@DAGToddBlanche), X, https://x.com/DAGToddBlanche/status/1937508924980154417 (June 24, 2025); Alexander Mallin, *Todd Blanche Says Media "Should Not Be Surprised" if They're Subpoenaed Over National Security Stories*, ABC NEWS (May 12, 2026, 11:47 AM), https://abcnews.com/US/todd-blanche-media-surprised-subpoenaed-national-security-stories/story?id=132881429.

10 *Kash Patel Speaks at CPAC*, C-SPAN (Feb. 23, 2024), https://www.c-span.org/program/public-affairs-event/kash-patel-speaks-at-cpac/638926

"Pharisees" who "held counsel against [Jesus],"[11] and imposed unprecedented restrictions on press access that the *Times* has successfully challenged in court,[12] including in a case brought by a reporter listed as a contributor to Mr. Cole's article.[13] As another federal court concluded last month, this conduct constitutes "powerful evidence" of the Administration's unconstitutional "retaliatory motive" against the *Times* and those who publish in its pages. *N.Y. Times Co. v. Dep't of Def.*, No. 1:26-cv-01690-PLF, (ECF No. 17), at 24 (D.D.C. June 30, 2026).

All of these officials report to a President who believes that the appropriate first response to disclosure of government information is to "go to the reporter & ask him/her," demand that the reporter reveal whistleblowers, and "[i]f not given the answer, put whoever in jail until the answer is given."[14] The President has been particularly direct in his attacks on the *Times*, which he regards as "treasonous" and "a true enemy of the people."[15] He has used DOJ to punish and deter anyone he deems critical of him or his family, Cole Mot. to Quash, at 5, ECF No. 2, so even if the assigned

---

[11] Phil Stewart & Idrees Ali, *Hegseth Invokes Bible to Compare Reporters to Enemies of Jesus*, REUTERS (Apr. 16, 2026), https://www.reuters.com/business/media-telecom/hegseth-invokes-bible-compare-reporters-enemies-jesus-2026-04-16/.

[12] Jocelyn Noveck, *Judge Orders Pentagon to Lift Policy Requiring Journalists to Be Accompanied by an Escort*, PBS NEWSHOUR (July 1, 2026), https://www.pbs.org/newshour/politics/judge-orders-pentagon-to-lift-policy-requiring-journalists-to-be-accompanied-by-an-escort.

[13] *Id.* (noting that Judge Friedman struck down restrictions on the grounds that the restrictions violated the rights of reporter Julian E. Barnes).

[14] Andrew Feinberg, *Trump Demands Politico Reporter and Editor Be Jailed to Expose Their Source for Supreme Court Dobbs Leak*, INDEP. (Jan. 19, 2023) https://www.independent.co.uk/news/world/americas/us-politics/donald-trump-politico-court-leak-abortion-b2265748.html.

[15] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 9, 2025, 9:11 p.m. EST), https://truthsocial.com/@realDonaldTrump/115692843128539904; Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 23, 2025, at 00:32 ET), https://truthsocial.com/@realDonaldTrump/posts/115767241940653010.

line prosecutors were unaware of Mr. Cole's forthcoming book about corruption in the Trump family's business dealings with Middle East allies—including Qatar, which gifted the President the Boeing 747-8 that prompted the latest round of demands to *Times* reporters—it is unlikely that the high-level officials who initiated the subpoena are similarly oblivious.

Courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F. 2d 1294, 1300 (2d Cir. 1977)). The bad faith that infuses this subpoena is obvious. And even putting bad faith aside, the subpoena is patently premature. The Government is nowhere near the point in its investigation when it could credibly assert that resort to the extraordinary measure of a [redacted] subpoena complies either with the Department's own regulations or the law. The Court should grant the motion to quash.

## ARGUMENT

### I. *Branzburg* and *Sterling* Do Not Authorize this Subpoena

The Government principally contends that *Branzburg v. Hayes*, 408 U.S. 665 (1972), and *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013), render any First Amendment considerations irrelevant whenever prosecutors assert a "legitimate law enforcement purpose" in compelling disclosure of a reporter's newsgathering activity. ECF No. 8, at 3. That is not the law, and the Government's own recitation of events highlights the sharp differences between the permissible subpoenas in those cases and the impermissible one here.

*Branzburg* expressly acknowledged that reporters retain First Amendment interests in their journalistic activity even in the face of grand jury subpoenas. 408 U.S. at 707. The Court wrote that "news gathering is not without its First Amendment protections;" that "without some protection for seeking out the news, freedom of the press could be eviscerated;" and therefore that

grand juries "must operate within the limits of the First Amendment." *Id.* at 681, 707–08. That language would make little sense if the Court believed a bare showing of a plausible investigative purpose automatically extinguished any First Amendment concern.

Justice Powell's concurrence makes this even clearer. He wrote separately to reject the reading the Government now advances: "The Court does *not* hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." *Id.* at 709 (Powell, J., concurring) (emphasis added). Noting the "limited nature of the Court's holding," Justice Powell described the decision as consistent with a case-by-case balancing approach in which courts weigh "freedom of the press and the obligation of all citizens to give relevant testimony"—a framework at odds with the Government's categorical position. *Id.* at 709–10 (Powell, J., concurring).

The Government attempts to limit *Branzburg*'s recognition of First Amendment protection only to circumstances involving bad faith or harassment. *See* ECF No. 8, at 7. While such circumstances are present here, *see infra*, at Part II, subpoenas to reporters can transgress the First Amendment even in their absence. Had the *Branzburg* Court meant that bad faith was the sole basis for challenging a media subpoena, it would have said so. In fact, *Branzburg* foreclosed that reading. 408 U.S. at 708. A bad-faith subpoena issued for the primary purpose of harassing the witness will fail for other reasons rooted in the Fifth Amendment's guarantee of due process. *Id.* By emphasizing that "grand juries must operate within the limits of the First Amendment *as well as* the Fifth," the Court confirmed that the former provides independent and additional protection even without a showing of bad faith. *Id.* (emphasis added).

In upholding the challenged subpoenas, *Branzburg* noted that they imposed only an "incidental burde[n]" on the First Amendment and the ability of journalists to inform the public.

408 U.S. at 682; *see also In re Shain*, 978 F.2d 850, 852 (4th Cir. 1992) (noting that the subpoenas at issue produced only an "incidental burden on the freedom of the press in the circumstances of this case"). Each of the subpoenas arose from investigations of unquestioned criminality that had nothing to do with the newsgathering function or the reporter's own conduct—production and use of narcotics (*Branzburg*); civil disorder, fires, and other unrest (*In re Pappas*); and explicit threats to assassinate the President (*Caldwell*). *Id.* at 672–75. None involved reporting on government activity or official malfeasance.

This subpoena is fundamentally different in character: It strikes at the heart of the freedom of the press because the focus of the Government's investigation *is* journalistic activity—and more specifically, journalism about actions undertaken by government actors. The only criminality DOJ hopes to smoke out is communication with a reporter who seeks to keep the public informed about the conduct of its government. The Government's avowed and explicit goal is to end reporting like Mr. Cole's in the national security space by punishing anyone who would provide the necessary information and intimidating any journalist willing to report on it. ECF No. 8, at 2–3, 16. For that reason alone, the subpoena raises First Amendment concerns that are orders of magnitude higher than those presented by the "incidental" effects the Court considered in *Branzburg*.

The extraordinary breadth of the subpoena compounds those concerns. DOJ's brief in opposition provides the best articulation of how drastically this subpoena departs from those challenged in *Branzburg* and *Sterling*. Unlike the narrow and targeted inquiries in those cases, this [redacted]

[redacted]

And in contrast to the posture of *Branzburg* and *Sterling*, the Government concedes that this subpoena comes at the early stages of an inchoate investigation. The Government does not yet know whether anyone who spoke to Mr. Cole committed a crime. ECF No. 8, at 16. Instead, the Government acknowledges that the [redacted] The contrast with *Branzburg* and *Sterling* could not be starker. *Sterling*, for example, involved a trial subpoena seeking confirmation of a single fact about a named defendant whom the government had already indicted. 724 F.3d 482, 507, 509 (4th Cir. 2013).

The asserted authority is tantamount to what *Branzburg* forbids: the "annex[ation of] the news media as an investigative arm of government." 408 U.S. at 709 (Powell, J., concurring) (internal quotation marks omitted). It has profound implications both for individual reporters and

for the principle of self-governance that depends on an informed citizenry. If this Court approves of this tactic, DOJ may haul before the grand jury any national-security adjacent reporter to answer a limitless set of questions intended to identify any and all of their contacts, whether or not any criminality is involved. For the reporter forced to [redacted] accumulated over years of work, the impact on reputation and standing in the community would be devastating. And for the public, the inevitable result would be diminished access, precisely when it is most necessary, to the kind of investigative journalism that has historically held government officials to account and spurred necessary reforms.

While the Supreme Court deemed analogous concerns raised in *Branzburg* insufficient to require recognition of a reporter's privilege in that case, the government power asserted here is far more sweeping and its chilling effect much more direct. 408 U.S. at 703–05; *see supra* at 7–9. Neither *Branzburg* nor *Sterling* approved compulsory process of such extraordinary scope or deployed in this pernicious way. While the precise contours of *Branzburg*'s First Amendment protection have not been definitively mapped, it must include the use of subpoenas to disrupt reporting aimed at holding the government accountable in the absence of any showing of need by the prosecution. The First Amendment protections that constrain the use of the grand jury process, and the broader public interests those protections serve, require this Court's intervention.

## II. The Subpoena is Infused with Bad Faith, Retaliatory Motive, and Harassment

As Mr. Cole detailed in his opening brief, [redacted] is one component of a larger effort to deter sources from speaking to reporters and to intimidate reporters whose coverage the Administration deems unflattering. ECF No. 2, at 5-9. Particularly in light of the subpoena's overbreadth and prematurity, these circumstances demonstrate with unusual clarity the harassment and retaliatory animus that infect it.

### A. *The Record Establishes a* Prima Facie *Case of Bad Faith*

The Government barely acknowledges the broader context, attempting to dismiss it as "public expressions of anger" by other "government officials" directed at "other journalists." ECF No. 8, at 18–19. A finding of retaliatory motive under *Branzburg* obviously does not require public attacks directed individually at Mr. Cole by the particular line attorneys now assigned to this matter. The Government has confirmed that the decision to issue and pursue this subpoena was made at much higher levels, by the very "government officials" whose comments it now seeks to ignore. *See* ECF No. 8, at 2, 4, 15–16. Those officials include the former Attorney General who approved the subpoena, the current Acting Attorney General whose name is on the Government's brief, the FBI Director who has personally overseen efforts to subpoena *Times* reporters, and the Secretary of Defense who leads the client Department. The "public expressions of anger" to which the Government refers are promises of retribution for the content of news reporting. ECF No. 8, at 18–19; ECF No. 2, at 24–27. And the "other journalists" those officials have attacked include the *New York Times*, the publication in which Mr. Cole's article prominently appeared. ECF No. 8, at 18–19; ECF No. 2, at 25, n. 22–23.

The Administration's vitriol toward the *Times* and the use of law enforcement against its reporters have dramatically accelerated since Mr. Cole filed his motion to quash. On Tuesday, July 7, the President criticized "The Failing New York Times" and referenced "all the ways in which The Times publishes, promotes, and deals in Fake News."[16] Three days later, on Friday, July 10, federal agents went to the homes of several *Times* reporters to serve subpoenas related to an article that had been published less than a day before reporting on flaws in the "new Air Force One" gifted

[16] Donald J. Trump (@realDonaldTrump), Truth Social (July 7, 2026, at 22:48 ET), https://truthsocial.com/@realDonaldTrump/posts/116882074981775044.

to President Trump by Qatar.[17] The subpoenas, which demand testimony on Wednesday, July 15, were issued after the FBI Director went to the White House to collaborate with the President's advisors in response to the President's angry reaction to the reporting.[18]

Other federal courts have had little difficulty recognizing this record for what it is: "evidence of retaliatory motive [through] myriad statements by Department officials expressing disdain for reporting by *The Times.*" *N.Y. Times Co. v. Dep't of Def.*, No. 1:26-cv-01690-PLF (ECF No. 17) at 23 (D.D.C. June 30, 2026). Most recently, in a case brought by a *Times* reporter who is listed as a contributor to Mr. Cole's article, a district court enjoined the Pentagon's press restrictions because they likely amount to unconstitutional retaliation and viewpoint discrimination. *Id.* at 3. There, as here, the Department sought to "dismiss these statements as innocuous expressions of the officials' opinions about how [the plaintiffs'] reporting itself might harm national security and whether the reporting is accurate." *Id.* at 24. That explanation "falls flat," the court concluded. *Id.* "The Department officials' rhetoric demonstrates that they harbored animosity for the plaintiffs because of their protected speech." *Id.* The court further found that the Department's conduct and statements overcame the presumption of regularity—"the presumption that the Department has acted in good faith." *Id.* at 31.

Federal judges in this District have reached the same regrettable conclusion. ECF No. 2, at 22. Specifically in the context of compulsory process issued to the media, Judge Porter concluded that the government's "conduct ha[d] disturbed th[e] baseline posture of deference" under which "this Court affords government attorneys a presumption of regularity." *See* Memorandum Opinion and Order (ECF No. 62), *In re the Search of the Real Property and*

[17] Grynbaum, *supra* note 1.

[18] Barrett, Thrush & Haberman, *supra* note 2.

*Premises of Hannah Natanson*, 1:26-sw-00054-WBP-AJT (E.D. Va. Feb. 24, 2026) at 10. Since then, DOJ rescinded grand jury subpoenas issued to three *Wall Street Journal* reporters and a *Washington Post* reporter, which were issued at the personal request of the President, shortly after those news organizations challenged the subpoenas in this District.[19]

This subpoena also fails. "Circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent," and the record of hostility and retaliatory animus here more than suffices to trigger *Branzburg*'s First Amendment protection against "official harassment of the press." *Bailey v. Ramos*, 125 F.4th 667, 685 (5th Cir. 2025); *Branzburg*, 408 U.S. at 707.

At a minimum, this record requires further justification by the Government and scrutiny by this Court of the role that retaliatory animus played in the initiation and maintenance of the subpoena. To the extent the Court believes that anything more is necessary before rejecting the subpoena, it should order the Government to rebut the *prima facie* case that Mr. Cole has established.

**B. *The Failure to Comply with Department Regulations Shows Bad Faith***

The Department's failure to comply with its own media subpoena policy further highlights the absence of good faith—and the Government's response to that argument proves the point.

"The policy's manifest purpose," the Government asserts, "is to (greatly) cabin the discretion of the Department's thousands of line prosecutors . . . by requiring the Attorney General's approval" for media subpoenas. ECF No. 8, at 17. Thus, the Government contends, checking that approval box always and invariably satisfies the regulations. In fact, the policy itself states its purpose: "to provide protection to members of the news media from certain law

---

[19] Richer & Tucker, *supra* note 7.

enforcement tools, whether criminal or civil, that might unreasonably impair lawful newsgathering activities." 28 C.F.R. § 50.10(a)(1). One way the policy does so is by requiring Attorney General approval, but a second, equally important way is by providing substantive instructions about when approval of this "extraordinary measure" is appropriate. *See* 28 C.F.R. § 50.10(c).

Entirely dismissing that substantive component, the Government contends that whatever the Attorney General decides must be right—that it is no business of this Court or anyone else if "the Department ignored or improperly evaluated the various considerations outlined in the policy." ECF No. 8, at 17. But the fact that the regulations create no freestanding individual remedy does not mean that they are irrelevant. To the contrary, since *Branzburg*, courts have consistently looked to the regulations in evaluating the permissibility of investigative activity aimed at the media.[20]

The Government does not even try to establish compliance. It rejects any requirement of "essentialness," even though the regulations state that subpoenas should be issued to reporters only when "the information sought is essential to a successful investigation or prosecution" and "should not be used to obtain peripheral, nonessential, or speculative information." ECF No. 8, at 12; 28 C.F.R. § 50.10(c)(4)(i)(A). Although the regulations counsel "all reasonable attempts to obtain the information . . . from alternative sources," 28 C.F.R. § 50.10(c)(4)(ii), the Government disavows

---

[20] Memorandum Opinion and Order (ECF No. 122), *In the Matter of the Search of the Real Property and Premises of Hannah Natanson*, 1:26-sw-00054-WBP-AJT (E.D. Va. May 4, 2026), at 15 (citing to 28 C.F.R. § 50 when determining the validity of DOJ investigatory practices towards a journalist); *Times Publ'g Co. v. United States*, No. 8:23-MC-0014-WFJ-SPF, 2023 WL 7411463, at *5 n.6 (M.D. Fla. Sept. 22, 2023) (noting that the government followed the guidelines promulgated under 28 C.F.R. § 50.10(i)(1) when applying for a warrant to search the home of a freelance journalist); *First Amendment Coalition v. Department of Justice*, No. 18-CV-05731 SBA, 2021 WL 4926977, at *15 (N.D. Cal. Mar. 31, 2021) (considering 28 C.F.R. § 50.10 in assessing the validity of DOJ's search terms in the seizure of certain records).

any such "heightened showing of need." ECF No. 8, at 11. The Government readily admits that it seeks two years' worth of reporting, including the identities of at least two dozen sources along with the substance of their conversations, *see* ECF No. 8, at 13–14, notwithstanding the policy's instruction that media subpoenas "should be narrowly drawn," encompass "a limited subject matter," and cover a "limited period of time." 28 C.F.R. § 50.10(c)(4)(v). And the Government concedes bypassing any pre-subpoena negotiation with Mr. Cole despite the provision requiring negotiation absent a certification that it would, among other things, "present an imminent risk of death or serious bodily harm." *See* ECF No. 8, at 4–5; 28 C.F.R. § 50.10(c)(4)(iii)(A).

This failure of compliance reflects the Department's cavalier attitude generally. It evidently took the former Attorney General all of two days to assess the multiple considerations set forth in 28 C.F.R. § 50.10(c)(4). The Department did not even submit a filing *ex parte*, as it usually does in such cases, explaining to this Court why this extraordinary measure is warranted.[21] And with the most recent subpoenas to the *Times*, *see supra* at II(A), which were issued within

[21] Notice of Ex Parte Filing (ECF No. 58), *In re the Search of the Real Property and Premises of Hannah Natanson*, No. 1:26-sw-00054-WBP-AJT, ECF No. 57 (E.D. Va. Feb. 23, 2026) (noting the government submitted an *ex parte* filing regarding its procedures in executing the search warrant); *United States v. Sterling*, 818 F. Supp. 2d 945, 948 (E.D. Va. 2011) (noting the government submitted a classified affidavit summarizing the evidence it had developed to support the issuance of the grand jury subpoena to a journalist); *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 177 (2d Cir. 2006), (Sack, J., dissenting) (noting that the U.S. Attorney filed an affirmation to demonstrate compliance with DOJ regulations regarding issuance of subpoenas to the media); *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1151 (D.C. Cir. 2006) (noting the government submitted an *ex parte* affidavit to demonstrate the reasonableness of the grand jury's subpoena to a journalist); *In re Special Counsel Investigation*, 332 F. Supp. 2d 26, 32 (D.D.C. 2004) (referencing the *ex parte* affidavit filed by the Special Counsel to show that DOJ guidelines were followed in issuing subpoenas to two journalists); *In re Grand Jury 95-1*, 59 F. Supp. 2d 1, at 6–7 (D.D.C. 1996) (noting that the Independent Counsel filed *ex parte* materials demonstrating that it explored alternative sources for the information sought in subpoenas issued to three journalists, and showing the requested materials were relevant and necessary to the investigation of criminal activity).

two days of the reporting they concern, the Department has given up any pretense of compliance with the regulations. None of this bespeaks any "sensitivit[y] shown to members of the press as a matter of policy." ECF No. 8, at 15–16.[22] It reflects a confirmation of the animus and retaliatory pattern that this DOJ has displayed toward reporters the Administration considers "enemies."[23]

## IV. The Subpoena Fails to Overcome the Qualified Reporter's Privilege under Rule 501

Mr. Cole explained in his opening brief that "reason and experience" now support the recognition of a qualified reporter's privilege under Federal Rule of Evidence 501. ECF No. 2, at 31. The Government offers three responses, none of which is persuasive.

First, the Government contends that *Branzburg* and *Sterling* foreclose reliance on Rule 501. ECF No. 8, at 6–9. But *Branzburg* preceded enactment of that Rule by three years, and while *Sterling* considered the issue, Rule 501 contemplates that federal common law privileges evolve with new circumstances. *Jaffee v. Redmond*, 518 U.S. 1, 8–9 (1996) ("The Rule thus did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges.'" (citations omitted)). Circumstances have changed materially since *Branzburg* and

---

[22] The Government contends that its willingness to delay the date of Mr. Cole's grand jury appearance is inconsistent with a finding of bad faith. ECF No. 8, at 18–19. In fact, any such delay was the result of former government counsel's insistence on certain logistical arrangements before disclosing the purported nature of the investigative interest in Mr. Cole. Once those logistical arrangements were in place, [redacted] and insisted on the June 8 testimony date.

[23] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 23, 2025, at 00:32 ET), https://truthsocial.com/@realDonaldTrump/posts/115767241940653010; *see also Kash Patel Speaks at CPAC*, C-SPAN (Feb. 23, 2024), https://www.c-span.org/program/public-affairs-event/kash-patel-speaks-at-cpac/638926.

*Sterling*. In 1972, only 17 states had laws codifying a common law reporter's privilege.[24] By 2013, when *Sterling* was decided, that number had increased to 39,[25] and today nearly every state has now recognized the need for a reporter's privilege, including Virginia, which did so after the *Sterling* decision.[26] The Supreme Court explained in *Jaffee* that "the policy decisions of the states bear on the question whether federal courts should recognize a new privilege." *Jaffee*, 518 U.S. at 12–13. As in *Jaffee*, the near-unanimous state recognition of the privilege provides compelling evidence that it "promotes sufficiently important interests to outweigh the need for probative evidence." *Id.* at 9–10 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).

Second, the Government contends that, unlike other common law privileges, the reporter's privilege does not "promote the public's interest in full and frank communications between persons in special relationships by protecting the confidentiality of their private communications." ECF No. 8, at 9. This case demonstrates why that argument is wrong. [redacted] At the crux of Mr. Cole's role as a reporter is the ability to communicate privately with sources and assess whether to rely on information conveyed by them. [redacted]. Just as confidentiality is

---

[24] *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1171 (D.C. Cir. 2006) (Tatel, J., concurring).

[25] *United States v. Sterling*, 724 F.3d 482, 531–32 (4th Cir. 2013) (Gregory, J., dissenting).

[26] *Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/reporters-privilege (last visited July 9, 2026).

necessary under Rule 501 for the content of other types of conversations, Mr. Cole's [redacted] also warrant protection.

Third, the Government assures this Court that it can trust in the Department's "sensitivit[y]" to First Amendment concerns and its self-restraint in issuing subpoenas of this kind. *See* ECF No. 8, at 15–16. That argument "falls flat." *N.Y. Times Co. v. Dep't of Def.*, No. 1:26-cv-01690-PLF (ECF No. 17) at 24 (D.D.C. June 30, 2026). "[T]he dynamics of leak inquiries afford a particularly compelling reason for judicial scrutiny of prosecutorial judgments regarding a leak's harm and news value." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d at 1176 (Tatel, J., concurring). Even in ordinary times, "if leaks reveal mistakes that high-level officials would have preferred to keep secret, the administration may pursue the source with excessive zeal, regardless of the leaked information's public value." *Id.*

This Administration has taken that zeal into uncharted territory. The record of this DOJ is not, to put it mildly, one of "sensitivit[y] shown to the members of the press as a matter of policy." *See* ECF No. 8, at 16. "[T]he elected and appointed officials" who populate this Administration have not demonstrated themselves to be "mindful" that attacks on the press will be "unpopular." ECF No. 8, at 15–16. It is a point of pride that they are not dissuaded by "confrontations with recalcitrant [media] witnesses." *Id.* Indeed, the Administration routinely disparages reporting on government misconduct—including the most foundational examples of investigative journalism—as a harmful product of the "deep state."[27] The irony in the Department's reliance on the

[27] Richard Nixon Foundation, *Vice President JD Vance at the Nixon Library*, YouTube (June 25, 2026), https://www.youtube.com/watch?v=cEVRarRWXU8 ("[I]f you look at the story of how the deep state took down Richard Nixon, it's not all that different from what the same groups of people, the same institutions, tried to do to Donald Trump in the first administration.").

restraining effect of its internal regulations is particularly rich; the former Attorney General diluted those regulations on the ground that they provided "overly broad procedural protections for media allies" who "undermine President Trump's policies," and, as this case and others illustrate, the Department regularly fails to abide by the guidance that remains.[28] The timing and circumstances surrounding the most recent round of subpoenas issued to the *Times* last week confirms that the Department has ceased even attempting to respect such policies.

Circumstances therefore now warrant recognition of a reporter's privilege under Rule 501. Under that analysis, the subpoena fails; it is not "highly relevant or material" to a pending case, "necessary or critical to the maintenance of that" case, and "[un]obtainable from alternative sources." *United States v. Burke,* 700 F.2d 70, 77 (2d Cir 1983). The most that the Government can say at this early stage of its investigation is that Mr. Cole's testimony "may well" turn out to be necessary after the Government proceeds beyond the cursory steps it has thus far taken. *See* ECF No. 8, at 4, 11 n.3. That premature and speculative assertion does not suffice here for the same reasons it cannot fulfill the Department's own regulations.

## CONCLUSION

The Court should grant the motion to quash, or, at a minimum, order the Government to rebut the *prima facie* showing of bad faith that the record establishes.

[28] Memorandum from Pamela Bondi, *supra* note 8.

Dated: July 13, 2026

Respectfully submitted,

/s/ Andrew Bosse
Andrew Bosse (VSB No. 98616)
abosse@bkbfirm.com
BAUGHMAN KROUP BOSSE PLLC
500 East Main Street, Suite 1400
Norfolk, Virginia 23510
Tel: (757) 904-5373

David A. O'Neil*
daoneil@debevoise.com
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave NW
Washington, DC 20004
Tel: (202) 383-8000

*Counsel for Movant Matthew Cole*
*Admitted *Pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on July 13, 2026, I sent a true and correct copy of the foregoing to counsel for the Government in the U.S. Attorney's Office for the Eastern District of Virginia and the National Security Division of the Department of Justice by electronic mail.

Respectfully submitted,

/s/ Andrew Bosse
Andrew Bosse (VSB No. 98616)
abosse@bkbfirm.com
BAUGHMAN KROUP BOSSE PLLC
500 East Main Street, Suite 1400
Norfolk, Virginia 23510
Tel: (757) 904-5373

*Counsel for Movant Matthew Cole*