# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

| | |
|---|---|
| In re: Grand Jury Subpoena,<br>MATTHEW COLE,<br>Subpoenaed Party. | Case No. 4:26dml<br>4:25G1/NN25-2386 |

**MATTHEW COLE'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Matthew Cole, by and through undersigned counsel, hereby submits his objections (the "Objections") to Magistrate Judge Miller's Report and Recommendation, ECF No. 12 ("R&R") concerning Mr. Cole's Motion to Quash, ECF Nos. 1, 2 ("Motion" or "Motion to Quash") the subpoena *ad testificandum* issued by the Department of Justice ("DOJ" or the "Department") seeking to compel his testimony before a grand jury in this District (the "Subpoena"). For the reasons set forth below, Mr. Cole respectfully submits that his Objections should be sustained and his Motion granted.

## INTRODUCTION

Through the first quarter of this Century, the Department of Justice issued testimonial subpoenas seeking to compel a reporter to disclose confidential sources in only three national security leak cases. This Subpoena is one of at least 10 that the Department has issued *in the past six months*. The Administration's unprecedented use of the grand jury process comes amid escalating attacks by the Executive Branch on the press, punctuated by declarations by the

President, the Secretary of Defense, the Attorney General, and the FBI Director that journalists whose work the Administration deems unflattering are "treasonous,"[1] akin to the biblical "Pharisees" who "held counsel against [Jesus],"[2] "disgusting,"[3] and the "most powerful enemy the United States has ever seen."[4]

The R&R recognized this "distressing," "worr[ying]," "lamentable," and "regrettable" reality but concluded that "*this case*" and "*this subpoena*" are somehow insulated from it. R&R at 21–26. That conclusion is fundamentally mistaken. This Subpoena reflects the same irregularities, illegality, and deficiencies that have prompted courts to carefully examine—and the Department ultimately to withdraw—every one of the other nine publicly reported subpoenas that the Administration has issued this year in its efforts to disrupt investigative journalism of the kind at issue here.

The Subpoena is unprecedented in its scope. The Government has not pointed to any previous subpoena in analogous circumstances that even approaches the breadth of this one, [redacted]

---

[1] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Dec. 9, 2025, 9:11 PM), https://truthsocial.com/@realDonaldTrump/115692843128539904.

[2] Phil Stewart & Idrees Ali, *Hegseth compares 'Trump-hating' reporters to enemies of Jesus*, REUTERS (Apr. 16, 2026), https://www.reuters.com/business/media-telecom/hegseth-invokes-bible-compare-reporters-enemies-jesus-2026-04-16/.

[3] Todd Blanche (@AGToddBlanche), X, https://x.com/DAGToddBlanche/status/1937508924980154417 (June 24, 2025, 9:51 AM); *see also* Alexander Mallin, *Todd Blanche says media 'should not be surprised' if they're subpoenaed over national security stories*, ABC NEWS (May 12, 2026), https://abcnews.com/US/todd-blanche-media-surprised-subpoenaed-national-security-stories/story?id=132881429.

[4] *Kash Patel Speaks at CPAC*, C-SPAN (Feb. 23, 2024), https://www.c-span.org/program/public-affairs-event/kash-patel-speaks-at-cpac/638926.

[redacted]. It is also an outlier in its timing. With the sole exception of the subpoenas the Department launched this year and then withdrew, the time between publication of the relevant reporting and issuance of the subpoena for testimony is shorter than in any other known national security leak investigation in modern history.

These two basic facts alone warranted a careful and probing evaluation of the circumstances surrounding the Subpoena. Instead, the R&R endorsed the Subpoena based on inferences drawn from unsworn suggestions in the Government's briefs, without oral argument, without holding a hearing, and without any evidence from the Government—much less the sort of detailed submission that prosecutors have previously made in support of what the Department itself purports to regard as an "extraordinary measure." 28 C.F.R. § 50.10(a)(3).

Mr. Cole objects to the R&R in full and for the specific reasons set forth herein, and he respectfully requests that the District Court grant the Motion. The R&R misstates the applicable law, disregards the severe damage that the Subpoena inflicts on First Amendment interests, incorrectly finds that the Department followed its own regulations despite (and without addressing) several instances of clear non-compliance, adopts a standard for bad faith that is inconsistent with precedent, and fails to recognize the need for common-law protections for newsgathering activity in light of changed circumstances.

At a minimum, Mr. Cole requests that the District Court subject the Subpoena to the searching review that the record and the stakes require. Judges in this District and elsewhere, confronted with similar departures from historical practice in the service of an Administration openly hostile to journalists and willing to use the criminal process to intimidate them, have recognized that the federal courts play an essential role in protecting a free press and the First Amendment. Newly unsealed filings illustrate how Judge Porter sharply questioned the

Government about both the scope of a subpoena to a *Washington Post* reporter and the Department's compliance with its regulations. This Court should do the same here.

## FACTUAL BACKGROUND

### I. Mr. Cole's Reporting

Mr. Cole is an investigative journalist who has covered national security for over two decades, focusing on America's clandestine wars and undisclosed government activity. Motion, Declaration of Matthew Cole at ¶ 1, ECF No. 2-3 ("Cole Decl.") . His reporting has also addressed potential corruption in foreign affairs; he currently has a book manuscript set for publication later this year detailing allegations that Jared Kushner, President Trump's son-in-law, traded his ability to influence the President in return for access to at least two bank accounts funded by foreign governments while Mr. Kushner served in the White House. Cole Decl. ¶ 12.

### II. *The New York Times* Article and the Subpoena

On September 5, 2025, *The New York Times* ("The Times") published an article co-authored by Mr. Cole (the "Article") about a failed military mission that President Trump had personally approved and that resulted in the death of several unarmed civilians.[5] The Article also reported that the Trump administration had improperly failed to brief Congress about the operation.[6] As with much of Mr. Cole's reporting, informing the public about these events was possible only with the assistance of sources who spoke to him strictly on the condition that their identities would never be disclosed. Cole Decl. ¶ 5. The Article stated that it was based on interviews with two dozen people, including civilian government officials, members of the first

---

[5] Dave Philipps & Matthew Cole, *How a Top Secret SEAL Team 6 Mission Into North Korea Fell Apart*, N.Y. TIMES (Sept. 5, 2025), https://www.nytimes.com/2025/09/05/us/navy-seal-north-korea-trump-2019.html (Motion, Ex. B, ECF No. 2-2).

[6] *Id.*

Trump administration, and current and former military personnel with knowledge of the events.[7] In conjunction with the Article, Mr. Cole published a statement on Substack concerning the source reporting that contributed to the Article, the steps he took to protect his confidential sources, and his decision to place the article with The Times.[8]

On February 8, 2026, without any advance warning or effort to negotiate with Mr. Cole directly or through The Times, agents of the Federal Bureau of Investigation went to Mr. Cole's home in New York to serve him with the Subpoena to testify before a grand jury in Newport News. Cole Decl. ¶¶ 8–9. The Government made clear that the information it seeks [redacted] Opposition to Motion to Quash, ECF No. 8 ("Opposition") at 13. The Government has also indicated that, unless Mr. Cole voluntarily discloses that information, it intends to force him to testify about [redacted] O'Neil Decl. ¶ 6.

### III. Executive Branch Use of the Criminal Process to Intimidate Reporters and Disrupt Source Relationships

The Subpoena results from an effort by the current Administration and DOJ to apply intense pressure on journalists whose work they deem unflattering to the President and his senior officials. The leadership of DOJ and the Department of Defense have made clear they intend to use every tool of government power to suppress unflattering coverage, including by preventing, disrupting, and punishing interactions between government officials and journalists who report on

---

7 *Id.*

8 Matthew Cole, *NYT Article About the SEAL Team 6 Mission to North Korea*, SUBSTACK (Sept. 5, 2025), https://matthewcole.substack.com/p/nyt-article-about-the-seal-team-6 (Motion, Ex. D, ECF No. 2-4).

government activity. The efforts include severe restrictions on reporters' access to government venues that have historically facilitated the free flow of information to the public,[9] changes to government employment contracts aimed at stopping employees from speaking to reporters, and internal investigations intended to identify any employee who does so.[10]

This Subpoena is part of one specific component of the Administration's campaign to disrupt newsgathering activity—the expanded use of DOJ and the criminal process, including grand jury subpoenas, to force the disclosure of confidential sources and to discourage reporters from exposing government misconduct.[11] The government has a need to keep legitimate secrets, but the law and DOJ regulations have long recognized that the pursuit of leakers must be tempered by the public's interest in a free press that holds public officials accountable and prevents the

---

9 *See, e.g.*, Scott Nover, *Pentagon bans journalists from press office, designating it a classified space*, WASH. POST (June 1, 2026), https://www.washingtonpost.com/national-security/2026/06/01/pentagon-bans-journalists-press-office-designating-it-classified-space/; Zach Montague, *White House Must Allow the Associated Press Full Access to Trump, Judge Rules*, N.Y. TIMES (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/us/politics/trump-ap-oval-office-access.html; *Associated Press v. Budowich*, No. 1:25-cv-00532-TNM, 2025 WL 1039572 (D.D.C. Apr. 8, 2025); Michael Kunzelman, *Judge sides with New York Times in challenge to policy limiting reporters' access to Pentagon*, ASSOCIATED PRESS (Mar. 20, 2026), https://apnews.com/article/pentagon-policy-news-reporters-hegseth-dc7a69b7e7c3f618b3879d9cafec9b25.

10 *See, e.g.*, Andrea Hsu, *Tired of leaks, the Trump administration wants federal workers to sign NDAs*, NPR (May 27, 2026), https://www.npr.org/2026/05/26/nx-s1-5835300/trump-opm-nda-leaks-federal-employees; Giselle Ruhiyyih Ewing, *Hegseth says staffers found leaking 'will be prosecuted' amid Pentagon chaos,* POLITICO (Apr. 22, 2025), https://www.politico.com/news/2025/04/22/pete-hegseth-leaks-investigation-00302506; Dan De Luce, *Tulsi Gabbard launches investigation into leaks at spy agencies*, NBC NEWS (Mar. 14, 2025), https://www.nbcnews.com/politics/national-security/tulsi-gabbard-launches-investigation-leaks-spy-agencies-rcna196526.

11 *See, e.g.*, The Editorial Board, *Trump, Iran's Assassins and John Bolton*, WALL ST. J. (July 19, 2026), https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c?mod=hp_opin_pos_1 ("[T]he Justice Department has subpoenaed New York Times writers who reported the story to disclose their sources. That's harassment against the press that won't make the U.S. safer.").

government from invoking "secrecy" as a smokescreen to hide misconduct. For that reason, the guiding principle for leak investigations has been that seeking evidence from the press is a last resort to be avoided if at all possible. "Because freedom of the press can be no broader than the freedom of members of the news media to investigate and report the news, the Department's policy is intended to provide protection to members of the news media from certain law enforcement tools, whether criminal or civil, that might unreasonably impair lawful newsgathering activities." 28 C.F.R. § 50.10(a)(1).

But this Administration has abandoned any such restraint in leak investigations. The President has stated that the appropriate first response to publication of confidential government information is to "[g]o to the reporter & ask him/her" to disclose confidential sources, and "[i]f not given the answer, put whoever in jail until the answer is given. You might add the publisher and editor to the list."[12] He has also stated: "When the reporter learns that he's going to be married in two days to a certain prisoner that's extremely strong, tough and mean, he will say . . . 'I think I'm going to give you the information. Here's the leaker, get me the hell out of here.'"[13] Consistent with that view, in 2025, then-Attorney General Pam Bondi (who, according to the Government, approved this Subpoena, *see* Opposition at 4), published a memo instructing all Department employees that members of the news media "must answer subpoenas," criticizing the previous administration's "overly broad procedural protections for media allies," and declaring

---

12 Andrew Feinberg, *Trump demands Politico reporter and editor be jailed to expose their source for Supreme Court Dobbs leak*, INDEP. (Jan. 19, 2023) https://www.independent.co.uk/news/world/americas/us-politics/donald-trump-politico-court-leak-abortion-b2265748.html.

13 David Remnick, *Stopping the Press*, THE NEW YORKER (Nov. 30, 2024), https://www.newyorker.com/magazine/2024/12/09/stopping-the-press.

that "[t]his Justice Department will not tolerate unauthorized disclosures that undermine President Trump's policies, victimize government agencies, and cause harm to the American people."[14]

The current Attorney General has warned that "[a]ny witness, whether a reporter or otherwise, who has information about these criminals should not be surprised if they receive a subpoena about the illegal leaking of classified material."[15] This was no idle threat. Since January, the Department has searched the home of a reporter who published stories the administration objected to and seized her papers, issued and then withdrew subpoenas to reporters at *The Washington Post* and *The Wall Street Journal*,[16] launched an investigation of *The Atlantic* for reporting about alleged misconduct by the FBI Director,[17] and most recently, issued subpoenas to reporters at The Times, an outlet the President has declared "A TRUE ENEMY OF THE PEOPLE,"[18] days after publication of articles reporting on security concerns about the airplane gifted to the President by Qatar.[19] The Department was forced to withdraw those subpoenas

---

14 Mem. from Pamela Bondi, Att'y Gen., U.S. Dep't of Just., for All Dep't Emps., *Updated Policy Regarding Obtaining Information From, or Records of, Members of the News Media* 2–3 (Apr. 25, 2025), https://www.justice.gov/oip/media/1399681/dl?inline.

15 Todd Blanche (@AGToddBlanche), X (May 12, 2026 at 9:51 AM), https://x.com/dagtoddblanche/status/2054197699486908639?s=46.

16 Alanna Durkin Richer & Eric Tucker, *Justice Department withdraws subpoenas that sought reporters' grand jury testimony, sources say*, ASSOCIATED PRESS (June 23, 2026), https://apnews.com/article/justice-department-fbi-media-c4fcb4d718d8313940f7c19a8f3f8e26.

17 Matt Viser & Shane Harris, *The FBI Is Reportedly Investigating a Leak to an Atlantic Writer*, THE ATLANTIC (May 6, 2026), https://www.theatlantic.com/politics/2026/05/kash-patel-investigation-atlantic/687072/.

18 Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Dec. 23, 2025, at 12:32 AM), https://truthsocial.com/@realDonaldTrump/posts/115767241940653010.

19 Alexandra Bruell, Melissa Korn & Jessica Toonkel, *Trump Lawsuits, Justice Department Subpoenas Squeeze News Outlets*, WALL ST. J. (July 24, 2026), https://www.wsj.com/business/media/trump-lawsuits-justice-department-subpoenas-squeeze-news-outlets-f4a08768.

following a hearing in which a federal court questioned the Department's "basic compliance with the law."[20]

The Subpoena at issue in this case—brought by FBI agents to an investigative journalist's home, issued as an early investigative step and in response to an article that reflected negatively on the President, published in a newspaper the President has declared an "enemy," and requiring disclosure of [redacted]—is part and parcel of the Administration's escalating abuse of the grand jury to intimidate, threaten, and harass.

## STANDARD OF REVIEW

A district court must "make a de novo determination of those portions of the magistrate judge's report or specified proposed findings or recommendations to which objection is made." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting 28 U.S.C. § 636(b)(1) (alteration omitted)). In evaluating the magistrate judge's report, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" and may also "receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

## ARGUMENT

The R&R erred in recommending denial of the Motion to Quash. The Subpoena intrudes on protected First Amendment rights because it is overbroad, speculative, and premature; it violates the Department's own regulations governing compulsory process to members of the news media; it was issued in a bad faith attempt to harass Mr. Cole and retaliate against him for reporting deemed unflattering to the Administration; and it fails to overcome the common law privilege for

---

[20] Hr'g Tr. at 12:15–16, 32:21–25, *In re Grand Jury Subpoenas Dated July 10, 2026*, No. 1:26-mc-00352-AS (S.D.N.Y. July 23, 2026), ECF No. 50.

source confidentiality. For these reasons, as detailed below, the Court should set aside the R&R's findings and decline the Government's request to endorse the Subpoena. In the alternative and at a minimum, the Court should conduct a fulsome inquiry concerning the strong indicia of bad faith, non-compliance, and retaliatory animus in the current record, including by requiring the Department to substantiate the conclusory assertions it has offered thus far.[21]

## I. The Subpoena Violates the First Amendment Because it is Overbroad, Speculative, and Premature

The R&R concluded that, under *Branzburg v. Hayes*, 408 U.S. 665 (1972), and *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013), the Subpoena is valid because prosecutors assert a "legitimate law enforcement need" to compel Mr. Cole's testimony. R&R at 11. That was error. Even putting aside the bad faith that infuses the record, the Government's own recitation of events highlights the dispositive differences between the subpoenas upheld in *Branzburg* and *Sterling* and the one here.

In upholding the subpoenas at issue in *Branzburg*, the Supreme Court noted that they imposed only an "incidental burde[n]" on the First Amendment and the ability of journalists to inform the public. 408 U.S. at 682; *see also In re Shain*, 978 F.2d 850, 852 (4th Cir. 1992) (noting that the subpoenas at issue produced only an "incidental burden on the freedom of the press in the circumstances of this case"). Each of those subpoenas arose from investigations of unquestioned criminality that had nothing to do with the newsgathering function, the reporter's own conduct, or

[21] At the time of filing these Objections, Mr. Cole's motion to compel the Government to disclose any other subpoenas or process issued to third parties relating to his business or communication records (the "Motion to Compel") is pending before this Court. *See* ECF No. 14. As set forth in that motion, there may be additional evidence of noncompliance with Department regulations that, because the Government has failed to say whether it has secured such process, Mr. Cole has not yet been able to make part of the record on his Motion to Quash. The Government has not yet responded to his Motion to Compel.

government actors. In one of the three consolidated cases the *Branzburg* Court considered, the reporting included a photograph of people engaged in the production of illegal drugs, and the government sought disclosure of those specific individuals' identities. *Id.* at 667–68. The second case concerned a single, isolated meeting at which the government alleged the reporter had witnessed criminal conduct. *Id.* at 672–75. And the third sought a reporter's testimony in support of the government's effort, documented through affidavits, to aid investigations into various criminal offenses, including against a charged defendant. *Id.* at 675–79. None of these cases involved reporting on government activity or official malfeasance. In *Sterling*, the subpoena was issued in the context of a criminal trial against a publicly named defendant in which substantial evidence had already been gathered to prove his criminal conduct. 724 F.3d at 498.

This Subpoena is fundamentally different in character: it strikes at the heart of the freedom of the press because the focus of the Government's investigation in this case *is* journalistic activity—and more specifically, journalism about efforts by government actors to evade congressional oversight. For that reason alone, the Subpoena raises First Amendment concerns that are orders of magnitude higher than those presented by the "incidental" effects the Court considered in *Branzburg*. 408 U.S. at 682.

The extraordinary breadth of the Subpoena compounds those concerns. Unlike the narrow and targeted inquiries in *Branzburg* and *Sterling*, this Subpoena seeks to compel information [redacted] Opposition at 3, 14, 16. According to its own briefs, the Government intends to press Mr. Cole about [redacted]

"[s]tarting with the original source who first spoke to Cole about the operation in 2023, to the last of the approximately two dozen people he says he interviewed." Opposition at 2–3, 13 (internal quotation marks omitted).

The R&R deemed the Subpoena permissible under the First Amendment based on a series of mistaken inferences, some of which went beyond what the Government itself asserted.

*First*, the R&R incorrectly reasoned that the Subpoena is not speculative because Mr. Cole necessarily witnessed a crime in the course of his reporting. R&R at 12. But even the Government has not gone that far. The Government asserts [redacted] Opposition at 14 (first emphasis added). The Subpoena is thus [redacted] Opposition at 16 (emphasis added). The contrast with *Branzburg* and *Sterling* could not be clearer. *Sterling*, for example, involved a trial subpoena seeking confirmation of a single point about a named defendant whom the government had already indicted. 724 F.3d at 507, 509.

*Second*, the R&R concluded that the Subpoena's scope was appropriate based on a finding that the Government "offered to narrow its request" [redacted] R&R at 13. That finding is both factually incorrect and legally irrelevant. It rests entirely on a single line in the Opposition stating that prosecutors had

"suggested a willingness" [redacted] Opposition at 5. But even according to the Government's own recitation of conversations with counsel, prosecutors never suggested that [redacted] would resolve the Subpoena. At no point did the Government state that it would withdraw the Subpoena upon receiving that information, amend the Subpoena to limit the testimony sought, or otherwise commit to restricting its examination [redacted]. Nor did the Government represent that it would forgo questioning Mr. Cole about [redacted], or other matters within the Subpoena's existing scope. The Government's briefing confirms that while it [redacted] Opposition at 13–14. The R&R thus transforms an isolated remark into a purported concession that never occurred. The Subpoena remained as broad after discussions with counsel as it was before. And as a legal matter, even if the Government had agreed to such a narrowing—which it did not—the Subpoena would still be impermissible for the reasons set forth in Mr. Cole's Motion to Quash. *See* Motion at 11–29. Among other things, such a step would change nothing about the process for issuing and the motivation underlying the Subpoena, which remains speculative and premature. The R&R was thus incorrect that the option [redacted] was available or relevant to the Motion.

*Third*, the R&R stated that the Government ameliorated the scope of the Subpoena by proposing, in lieu of grand jury testimony, "a voluntary interview—or even an attorney proffer—regarding [redacted] R&R at 19 (quoting Opposition at 5). But the harm to First Amendment interests is the disclosure of [redacted], not the way that

disclosure takes place. The harm would be as fully realized by Mr. Cole's counsel divulging the [redacted] in a meeting with prosecutors as by Mr. Cole doing so in the grand jury room. Both require the breach of Mr. Cole's commitment to confidentiality and would hinder Mr. Cole's ability to report in the future. *See* Cole Decl. ¶¶ 3, 5. An attorney proffer of the same information the Government seeks to compel through testimony is neither a narrowing of the Subpoena nor a less intrusive alternative.

*Fourth*, the R&R rejected Mr. Cole's argument that the Subpoena is speculative and premature by observing that, according to the Government's representations, the Subpoena was issued five months after the Article appeared. R&R at 10. That fact should *heighten* concerns about the legitimacy of the Subpoena, not dispel them. By historical standards, five months is an extraordinarily short time from publication to the "extraordinary measure[]" of compelling reporter testimony. 28 C.F.R. § 50.10(a)(3).[22] By contrast, one of the defining characteristics of this year's slew of media subpoenas is the haste with which the Department issued them.[23] That the

[22] *See, e.g.*, Aff. of Spec. Agent Kevin Shirley at ¶¶ 52–54, *In re: Grand Jury Subpoena*, Misc. No. 11-261 (D.D.C. May 31, 2011) (detailing how the Department investigated for 12 months before even contacting the reporter and approximately 6 more months before issuing a subpoena); *United States v. Sterling*, 818 F. Supp. 2d 945, 947 (E.D. Va. 2013), *rev'd*, *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013) (noting that the grand jury investigation was opened nearly two years before the Department sought reporter testimony).

[23] *See, e.g.*, Mem. Of Law in Supp. of Movants' Mot. to Quash at 7–8, *In re Grand Jury Subpoenas Dated July 10, 2026*, No. 1:26-mc-00352-AS (S.D.N.Y. July 15, 2026), ECF No. 23 (noting that the Articles were published on July 8 and 9, 2026, and the subpoenas were issued on July 10); Mem. of Law in Supp. of Ellen Nakashima's Mot. to Quash at 2, *In re Grand Jury Subpoena*, No. 1:26-dm-1-WBP (E.D. Va. Apr. 7, 2026), ECF No. 18-2 (subpoena issued two months after reporter sought verification from the government on a potential article); *see also* Sarah N. Lynch, *Justice Department defends decision to subpoena Wall Street Journal reporters, citing national security*, CBS NEWS (May 12, 2026), https://www.cbsnews.com/amp/news/justice-department-wall-street-journal-subpoenas (articles published in Wall Street Journal on February 23; subpoenas served on March 4, 2026).

Department demanded Mr. Cole's testimony within months of the Article's publication underscores that this Subpoena does not reflect the caution and sensitivity to First Amendment interests that characterized the rare and few historical instances of compelled reporter testimony.

*Fifth*, the R&R misconceived Mr. Cole's argument that the First Amendment protects against demands for source disclosure that sweep so broadly, and that are issued so prematurely, that they hinder the ability of reporters to inform the public. R&R at 15. In the R&R's reframing, the argument is cast as Mr. Cole urging that "disclosure of this particular classified information served the public interest and should not be criminalized." R&R at 15. But that is not Mr. Cole's contention. Rather, he submits that the characteristics of this Subpoena and other recent ones like it—overly broad in scope, prematurely issued, and speculative in purpose—render them incompatible with the First Amendment. *See* Motion at 10 (the Subpoena "represents an excessive and unwarranted intrusion on the newsgathering function, both because it is grossly overbroad and because it was not issued in good faith"). The issue is not whether the specific disclosures underlying Mr. Cole's reporting were themselves in the public interest. The question instead is whether the Government may, consistent with the First Amendment, compel disclosure of a reporter's [redacted]. For the reasons Mr. Cole explained at length in his briefing, the answer is no.[24]

[24] In addition, and for the reasons set forth more fully in his Motion to Quash, Mr. Cole submits that, to the extent *Sterling* is read as foreclosing any First Amendment review without a showing of bad faith, the Fourth Circuit should revisit the issue to bring circuit precedent in line with *Branzburg*. Motion at 13, n.19.

## II. The Department Failed to Comply with Its Own Regulations

The R&R correctly noted the importance of the federal regulations governing media subpoenas and of the Department's adherence to those regulations. As the R&R observed, compliance is necessary to ensure that prosecutors do not "annex the news media as an investigative arm of law enforcement." R&R at 16 (quoting *Sterling*, 724 F.3d at 497). The R&R erred, however, in its conclusion that the Department complied with the regulations in this case. R&R at 16–20. Indeed, as to most of the violations that Mr. Cole identified in his Motion, the R&R failed to evaluate the Department's conduct against the regulatory provisions; where it did engage with the substance, the R&R's analysis was incorrect.

*First*, the regulations require that, before issuing a subpoena to a reporter, the Government must make "all reasonable attempts to obtain the information" from "alternative sources." 28 C.F.R. § 50.10(c)(4)(ii). Not even the Government contends that it has done so. *See* Opposition at 4 (describing its other investigative steps as "gathering and review of internal government records, numerous voluntary witness interviews, and applications for the issuance of other legal process from this Court"). The R&R concludes that the Department satisfied the regulations because issuance of the Subpoena was "far from the first step" in the investigation. R&R at 20. But making *some* effort to obtain information from alternative sources is not the same as making *all* reasonable efforts to do so. The R&R found only the former, while the regulations require the latter. *See* R&R at 19–20. As the R&R elsewhere recognizes, what is necessary is "prior *exhaustion* of less intrusive investigative avenues." R&R at 24 (emphasis added). The Government has not made that showing here, nor has it offered any actual evidence to support such a finding. On the record as it stands now, it is undisputed that no such exhaustion occurred. To excuse the deficiencies in the Opposition, the R&R found that the Government's submissions were "sufficient to determine that the United States did not haphazardly issue the grand jury

subpoena." R&R at 20. But the regulations provide specific conditions that the Government should meet; they require exhaustion, not just refraining from "haphazardly" issued process. *See* 28 C.F.R. § 50.10(c)(4)(ii).

*Second*, the regulations require that "there should be reasonable grounds to believe, based on public information, or information from sources *other* than the member of the news media who would be the target of the requested compulsory process, that a crime has occurred." 28 C.F.R. § 50.10(c)(4)(i)(A) (emphasis added). The Government has never cited any basis other than the Article and Substack post authored by Mr. Cole—"the member of the news media who [is] the target" of the Subpoena—for its demand. O'Neil Decl. ¶ 4; 28 C.F.R. § 50.10(c)(4)(i)(A). The R&R quotes this provision but otherwise does not address it. R&R at 16.

*Third*, contrary to the regulations, DOJ made no attempt to negotiate with Mr. Cole before serving him with the Subpoena. Cole Decl. ¶¶ 8–9; 28 C.F.R. § 50.10(c)(4)(iii)(A) (indicating that negotiation should precede compulsory process except upon certification by the Attorney General of extraordinary circumstances). The Government acknowledges that it never sought to contact, much less negotiate with, Mr. Cole before FBI agents brought the Subpoena to his home, and the Government does not represent that it obtained the certifications necessary to forego negotiation. *See generally* Opposition.

The undisputed record therefore establishes non-compliance with this requirement, but the R&R does not address it. Instead, it notes only that prosecutors "engaged in negotiations with Cole's counsel" *after* serving the Subpoena, R&R at 19—an observation that is irrelevant to the Department's compliance with the regulations, which requires such negotiation *before* the subpoena is issued. 28 C.F.R. § 50.10(c)(4)(iii)(A). The R&R's approach contrasts sharply with a recent argument in this District involving issuance of a subpoena *ad testificandum* to another

journalist. Judge Porter pointedly questioned the government attorneys about this provision, forcing them to concede that they did not negotiate with the journalist before issuing the subpoena. Hr'g Tr. at 18:15–18, *In re Grand Jury Subpoena*, No. 1:26-dm-1-WBP (E.D. Va. May 22, 2026), ECF No. 18-10. The government withdrew the subpoena shortly after argument.[25]

*Fourth*, the Subpoena is not, as the regulations require, "narrowly drawn," directed at "material and relevant information regarding a limited subject matter," and confined to "a reasonably limited period of time." 28 C.F.R. § 50.10(c)(4)(v). Indeed, it is just the opposite: the Government is demanding [redacted]. Motion at 24. The R&R also does not address this requirement. It simply asserts, in the course of addressing different arguments, that the Subpoena is "tailored" to this investigation and that, as in *Sterling*, the information the Government seeks "goes to the heart of the prosecution"—even though, unlike in *Sterling*, there is no prosecution in this case or even an identified set of suspects. R&R at 11, 13 (quoting *Sterling*, 724 F.3d at 499).

In a footnote acknowledging that the Government submitted no evidence in support of its actions, the R&R asserts that, "in order to subpoena a member of the news media," the "line prosecutors need the approval of the Attorney General, which they obtained in this case." R&R at 18 n.5. To the extent that reflects a conclusion that Attorney General approval is *all* that the regulations require, it is incorrect. The stated purpose of the regulations is "to provide protection to members of the news media from certain law enforcement tools, whether criminal or civil, that

---

[25] Order, *In re Grand Jury Subpoena*, No. 1:26-dm-1-WBP (E.D. Va. June 9, 2026), ECF No. 18-12 (denying as moot motion to quash after the government released the reporter "from any obligation under the subpoena" and ordering that any further legal process to the reporter to produce information or testify in the Eastern District of Virginia "be filed under this case number").

might unreasonably impair lawful newsgathering activities." 28 C.F.R. § 50.10(a)(1). One way the regulations further that goal is by requiring Attorney General approval—a process that in this case took all of 48 hours, Opposition at 4—but a second, equally important way is by providing substantive instructions about when approval of this "extraordinary measure" is appropriate. 28 C.F.R. § 50.10(a)(3); *see* 28 C.F.R. § 50.10(c). Ever since *Branzburg*, courts have consistently looked to the substantive component of the regulations in evaluating the permissibility and good faith of investigative activity aimed at the media.[26] As Judge Porter noted earlier this year, "if [the government is] relying on the presumption of regularity, one might think that the government needs to follow its own policy." Hr'g Tr. at 11:4–7; 17:2–21:11, *In re Grand Jury Subpoena No.*, No. 1:26-dm-1-WBP (E.D. Va. May 22, 2026), ECF No. 18-10. The failure of the Government even to attempt to demonstrate compliance with those requirements is powerful confirmation of the irregularity of this Subpoena.[27]

---

[26] Hr'g Tr. at 11:14–16:13, *In re Grand Jury Subpoenas Dated July 10, 2026*, No. 1:26-mc-352-AS (S.D.N.Y. July 23, 2026), ECF No. 50 (confirming the government's awareness of the regulations and probing whether the government attempted to comply); *In re Search Warrants*, Nos. 26-mj-205 (JFD); 26-mj-206 (JFD); 26-mj-207 (JFD); 26-mj-208 (JFD), 2026 WL 1487454, at *3 (D. Minn. Mar. 6, 2026) (citing the lack of compliance with various components of 28 C.F.R. § 50.10(c), including no indication of negotiations and a lack of narrowly drawn warrant applications); *In re Williams*, 766 F. Supp. 358, 362 & n.6 (W.D. Pa. 1991) (noting negotiations must be pursued when seeking to subpoena members of the media, pursuant to 28 C.F.R. § 50.10(c)); *see also In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1174–75 (D.C. Cir. 2006) (Tatel, J., concurring) (noting that the DOJ guidelines, particularly the need for evidence and exhaustion of alternatives, can be considered in assessing whether compelled disclosure of a reporter's source is justified).

[27] Since the Motion was fully briefed, additional potential violations of the regulations have come to light. As set forth in detail in Mr. Cole's Motion to Compel, *see* ECF No. 14 at 3, if the Government issued any subpoenas to third parties seeking business or communications records for Mr. Cole, it was obligated to either provide notice ahead of time or, in the case of circumstances very unlikely to be present here, notify Mr. Cole no later than 90 days after receiving the records from the third party. *See* 28 C.F.R. § 50.10(b)(2)(i) & (e)(1)(i). The Government has refused, despite repeated requests, to address whether it has sought communication or business records for Mr. Cole or others associated with him through process to third parties. Motion to Compel, Ex. A, ECF No. 14-1. If it has done so, the Government

## III. This Subpoena Was Issued in Bad Faith, Constitutes Harassment, and Reflects Retaliatory Animus

In his Motion, Mr. Cole demonstrated that the circumstances of this case established a *prima facie* showing that the Subpoena was issued in bad faith and therefore that *Branzburg* requires that it be quashed. Motion at 24–29. The R&R's rejection of that argument rests on two fundamental errors.

*First*, relying on its incorrect findings that the Subpoena is not overbroad and that the Department complied with the regulations, the R&R limited its analysis of bad faith solely to what it described as the "broader context" of "the deterioration of the relationship between the government and the media." R&R at 10, 24. The "portion of the Report" dedicated to evaluating bad faith therefore addressed only "the current presidential administration's actions described in Cole's briefing, and whether *standing alone*, they support Cole's bad-faith argument." *See* R&R at 20 n.6 (emphasis added). That was not the correct inquiry. To be sure, Mr. Cole contends that the Government's alarming and escalating attacks on journalists provide powerful evidence of retaliatory animus. *See* Motion at 24–29. His fundamental argument, however, is that, considered against the full record of this case—the nature and timing of the Government's demands, the Department's failure to comply with its policies, the vitriolic statements by the specific senior officials who approved these actions, and the focus of Mr. Cole's reporting—*this* Subpoena suffers from the same irregularities and flaws as the other illegitimate ones the Administration has launched this year. Reply at 11–17. The bad faith that renders the Subpoena invalid, Mr. Cole contends, is a result of the confluence of all those facts. *See* Reply at 11.

---

is in clear and incontrovertible violation of 28 C.F.R. § 50.10(e). The Government's response to the Motion to Compel is due on August 18.

The Fourth Circuit has made clear that courts should evaluate a subpoena's legality by considering whether the full mix of asserted grounds, "even if insufficient to do so individually, provide sufficient support [to quash] when taken as a whole[.]" *In re Grand Jury Subpoena*, 175 F.3d 332, 338 (4th Cir. 1999). The R&R takes the opposite approach: it "ask[s] whether" each single consideration in this totality-of-the-circumstances analysis "'by itself' passes some threshold"—putting "evidence in compartments and ask[ing] whether each compartment suffices." *United States v. Vaughn*, 62 F.4th 1071, 1072 (7th Cir. 2023) (Easterbrook, J.) (describing this as a "persistent error in legal analysis"). The Supreme Court has rejected that kind of "divide-and-conquer analysis" because it ignores "that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *District of Columbia v. Wesby*, 583 U.S. 48, 60–61 (2018) (citing *United States v. Arvizu*, 534 U.S. 266, 277–78 (2002)). For the reasons Mr. Cole has explained, the sum of all the circumstances in this case establishes bad faith.

*Second*, to the extent that the R&R acknowledges the indications of retaliatory animus and harassment that Mr. Cole identified, it deflects them based on reasoning that not only lacks support in precedent but also creates a standard of bad faith that no case could ever meet. The R&R asserts, for example, that the promises of retribution directed specifically at The Times by senior administration officials—the President, the former Attorney General who approved this Subpoena, the FBI Director whose agency opened this investigation, and the Secretary of Defense who was required to certify his support for the Subpoena before it was issued[28]—are irrelevant because they

[28] DOJ's regulations provide that, "[i]n investigations of unauthorized disclosures of national defense information or of classified information," the Attorney General is authorized to issue subpoenas to members of the media "where the relevant Department or agency head certifies to the Attorney General the significance of the harm raised by the unauthorized disclosure and that the information disclosed was properly classified, and reaffirms the Department's or agency's continued support for the investigation and prosecution." 28 C.F.R.

were not made by the "prosecuting attorney of record in this case," R&R at 26, and because they do not "express specific animus toward Cole or the article here," R&R at 25.[29] Similarly, the R&R dismisses the possibility of retaliatory motive arising from Mr. Cole's forthcoming book about corruption in the Trump family's Middle East business dealings because the line attorneys on the case disclaimed any prior knowledge of that reporting, and because the book "does not relate to the scope of this subpoena." R&R at 25 n.12.

The result is a rigid and unrealistic threshold for finding bad faith. The reasoning in the R&R would permit such a finding only if the specific line attorneys assigned to pursue a subpoena themselves harbor animus against the subpoenaed reporter and express it by publicly attacking him—and, even then, only if the subpoena seeks testimony about the specific topic that gives rise to the prosecutors' retaliatory animus. That conception of "bad faith" finds no support in *Branzburg*, nor does it capture what *Branzburg* meant by requiring a "case-by-case" analysis. 408 U.S. 665, 710 (Powell, J., concurring); *see Bd. of Governors of Fed. Res. Sys. v. United States (In re Grand Jury Subpoenas)*, 823 F. Supp. 3d 1, 9 (D.D.C. 2026) ("[A]n abusive purpose need not be clearly identified in precedents for a court to deem it improper. Instead, improper purposes are as numerous and protean as are the opportunities for prosecutors to misuse their power."). The standard adopted by the R&R would mean that courts could not find bad faith even if the President

---

§ 50.10(c)(4)(iv). Assuming DOJ is investigating leaks of information concerning military operations, that department head would be the Secretary of Defense.

29 In fact, the record does contain evidence supporting the conclusion that the President had reason to retaliate for the specific reporting at issue. *See* Reply at 4. The R&R fails to note that the President was asked specifically about the Article and falsely denied knowledge of the operation, even though he had personally approved it. *See* Reply at 4 n. 6 (citing Ivan Pereira, *Trump Says He Doesn't Know "Anything" About Reported Violent, Failed SEAL Team 6 Mission in North Korea,* ABC NEWS (Sept. 5, 2025, 7:11 PM), https://abcnews.com/Politics/trump-reported-violent-failed-seal-team-6-mission/story?id=125300720).

and senior members of his Administration, angered and embarrassed by reporting they deemed unflattering, sought to intimidate journalists and deter further reporting by directing line prosecutors to issue subpoenas requiring the wholesale disclosure of source relationships. So long as the case was assigned to a prosecuting attorney who was personally uninvested in the retaliatory motive, the subpoena would be insulated from review, and courts would be powerless to intervene.

The R&R's focus on the "prosecuting attorney[s] of record in this case" is particularly misplaced. R&R at 27. The Government's brief makes clear that the currently assigned attorneys were not involved in the initiation of this Subpoena. *See* Opposition, at 16–17 (describing the actions of "predecessors to the undersigned who were then assigned to the case but who are no longer at the Department"). Line attorneys are not independent actors; they are representatives of the broader Department of Justice whose instructions they carry out and actions they defend. The Government states that this investigation was opened by, among others, the FBI, *see* Opposition at 4, which is led by a Director who has sued The Times[30] and who, since the Motion was filed, personally directed the issuance of subpoenas to five of its journalists at the direction of the White House.[31] The Government asserts that the Subpoena was approved in two days by the former Attorney General, Opposition at 4, who promised to pursue "media allies" of the previous Administration and declared that "[t]his Justice Department will not tolerate unauthorized

---

30 Carl Campanile, *Trump security adviser Kash Patel sues NY Times over Ukraine Story*, N.Y. POST (Nov. 27, 2019) https://nypost.com/2019/11/27/trump-security-adviser-kash-patel-sues-ny-times-over-ukraine-story/.

31 Devlin Barrett, Glenn Thrush & Maggie Haberman, *White House Directed Patel to Oversee Investigation Involving Times Reporting*, N.Y. TIMES (July 11, 2026) https://www.nytimes.com/2026/07/11/us/politics/white-house-patel-investigation-times.html.

disclosures that undermine President Trump's policies."[32] The first name on the Government's brief is the Attorney General, who has described The Times as a "purported news outlet" that produces "disgusting journalism" and has warned reporters that they should expect subpoenas when they write about national security.[33]

Mr. Cole's contention is that the bad faith that renders this Subpoena invalid lies with those senior members of the Executive Branch. The natural and logical conclusion is that they considered Mr. Cole's reporting unflattering, wished to deter further such reporting by him and other "treasonous" journalists, and therefore directed the use of the criminal process against him. That bad faith does not disappear because the defense of the Subpoena is now being handled by line attorneys who did not participate in that process. Nor is the Government "necessarily acting for a proper purpose just because," in the view of the assigned line attorneys, the Subpoena "seeks information relevant to a criminal investigation." *Bd. of Governors of Fed. Res. Sys.*, 823 F. Supp. 3d at 10, 17 (granting a motion to quash even though "the subpoenas are certainly relevant to a criminal investigation"). This Court need not question the intentions of the assigned AUSA to find bad faith here, but it also must not blind itself to the explicit and avowed intentions of the Administration's leadership to intimidate reporters and publications they dislike and to use the criminal process in furtherance of that goal. *See* Motion at 11–15.

---

[32] *Supra* note 14.

[33] Todd Blanche (@AGToddBlanche), X, https://x.com/DAGToddBlanche/status/1937508924980154417 (June 24, 2025, 9:51 AM); Alexander Mallin, *Todd Blanche says media "should not be surprised" if they're subpoenaed over national security stories*, ABC NEWS (May 12, 2026, 11:47 AM), https://abcnews.com/US/todd-blanche-media-surprised-subpoenaed-national-security-stories/story?id=132881429.

## IV. Rule 501 Supports the Recognition of a Common-Law Reporter's Privilege That Would Defeat this Subpoena

Mr. Cole explained in his Motion to Quash that changed circumstances now warrant the recognition of a common law privilege that defeats this Subpoena. Motion at 31–35. He objects to the R&R's rejection of that argument. *See* R&R at 26–28.

In recommending against a Rule 501 privilege, the R&R relied exclusively on the Fourth Circuit's decision in *Sterling*, which in turn rested on the premise that *Branzburg* had decades before refused to accept a similar argument. R&R at 26–27; *Sterling*, 724 F.3d at 499–505. But *Branzburg* did not consider Rule 501, which was enacted three years later,[34] and the Court's decision was based on certain assumptions about the relationship between government and the media that, as Mr. Cole detailed in his briefing, no longer hold true today. Motion at 31–35. Those changes have also been accompanied by meaningful developments in the policy landscape—including near universal acceptance of a reporter's privilege by the States[35]—that now support judicial recognition of an analogous privilege at the federal level.

The R&R acknowledged the Department's departure from historical norms, including its "heavy reliance on subpoenas for members of the news media" and "the lack [of] DOJ self-restraint as a form of meaningful protection against a prosecutor's misuse of the grand jury process." R&R at 27. The R&R further recognized that those changes are real, "of legitimate concern," "worr[ying]," "distressing," "lamentable," and "regrettable." R&R at 21, 24, 26. Yet the R&R failed to contend with the argument that recognizing a reporter's privilege in light of the current

---

[34] *Federal Rules of Evidence*, UNITED STATES COURTS, https://www.uscourts.gov/forms-rules/current-rules-practice-procedure/federal-rules-evidence (last visited Aug. 13, 2026).

[35] *See Reporter's Privilege Compendium*, REPORTERS COMM. FOR FREEDOM OF THE PRESS, https://www.rcfp.org/reporters-privilege (last visited Aug. 13, 2026).

legal landscape follows from the controlling principles. *See, e.g.*, FED. R. EVID. 501 (instructing federal courts to develop privilege law "in the light of reason and experience"); *see also Jaffee v. Redmond*, 518 U.S. 1, 8–9, 12–13 (1996) (acknowledging a new privilege where circumstances demonstrated the social importance of that protected relationship and describing the "reason and experience" standard as inherently dynamic).

Recognizing a privilege here would not conflict with the holdings in *Sterling* or *Branzburg.*[36] The Government's recent prosecutorial activity frustrates the premise of those decisions, including assumptions about the Department's strict adherence to robust regulations as well as the traditional role of the grand jury as a shield against unfounded prosecutions. *See supra* at 5–9. The R&R did not refute that several other circuits have, since *Branzburg*, adopted a qualified privilege for reporters that would protect the newsgathering activity at issue here. R&R 26–28; *see, e.g.*, *United States v. Burke*, 700 F.2d 70, 77–78 (2d. Cir. 1983) (recognizing a qualified reporters' privilege); *United States v. Cuthbertson*, 630 F.2d 139, 146–48 (3d Cir. 1980) (same); *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013) (same). Nor did the R&R address Mr. Cole's argument that even more states—including Virginia—have officially codified a reporter's privilege since *Sterling*. *See* Reply at 18. Today, unlike when *Branzburg* was decided, nearly every state has now recognized the need for such protection. *See* Reply at 18. As the Supreme Court recognized in *Jaffee*, "the policy decisions of the states bear on the question whether federal courts should recognize a new privilege." *Jaffee*, 518 U.S. at 12–13. Contrary to the R&R, Rule 501 supports qualified protection for reporters' ability to gather the news, and for

---

[36] To the extent *Sterling* is construed as prohibiting the recognition of a common law reporter's privilege, it should be reevaluated.

the reasons Mr. Cole explained in his briefing, that protection would overcome the Subpoena in this case. *See* Motion at 29.

**V. At a Minimum, the Record and the Stakes Require an Evidence-Based Examination of the Circumstances That Gave Rise to this Subpoena**

In the alternative, and at a minimum, Mr. Cole respectfully requests that this Court conduct or order further proceedings that will permit the development of an appropriate evidentiary record. *See United States v. George*, 971 F.2d 1113, 1117–18 (4th Cir. 1992), *as amended* (Aug. 12, 1992) ("After conducting *de novo* review, a 'judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.'") (quoting 28 U.S.C. § 636(b)(1)); *O'Neal v. Clarke*, No. 2:19CV139, 2020 WL 2319919, at *2 (E.D. Va. May 8, 2020) (recommitting case to magistrate judge "to develop the record through discovery, additional briefing, hold an evidentiary hearing if necessary, and to submit to the [] district judge proposed findings of fact, if applicable, and recommendations for the disposition of [the claim]"); *see also* Order, *United States v. Comey*, No. 1:25-cr-272-MSN (E.D. Va. Nov. 7, 2025), ECF No. 167 (remanding to the magistrate judge for further proceedings and analysis).

The federal courts asked to review the other nine subpoenas issued to reporters this year have engaged in a searching inquiry commensurate with the important First Amendment interests at stake and the powerful indicia of bad faith and improper purpose outlined above. Judge Porter's probing questions about the scope of a subpoena to a *Washington Post* national security reporter and the Department's compliance with its regulations exemplifies this scrutiny. Hr'g Tr. at 11:4–7; 12:11–13:11; 17:2–21:11, *In re Grand Jury Subpoena*, No. 1:26-dm-1-WBP (E.D. Va. May 22, 2026), ECF No. 18-10 (recognizing that the government did not submit a declaration and inviting an evidentiary submission supporting assertions about investigative steps and compliance); *see*

*also, e.g.*, Hr'g Tr. at 3:16–4:22, 5:17–8:5, 10:13–30:8, *In re Grand Jury Subpoenas Dated July 10, 2026*, No. 1:26-mc-00352-AS (S.D.N.Y. July 23, 2026), ECF No. 50 (probing government attorneys on compliance with regulations and applicable law).

The R&R, which was issued without oral argument and without an evidentiary hearing, does not reflect a commensurate inquiry. On the critical points, the R&R credited the Government's assertions and explanations even though the Government declined to substantiate them with any evidentiary submission—*ex parte* or otherwise. R&R at 18. Thus, for example, the R&R agreed that "the deterioration in the relationship between the government and the media" has "given rise to investigative measures directed at identifying confidential journalistic sources without the prior exhaustion of less intrusive investigative avenues or adherence to procedural safeguards ordinarily expected of prosecutors." R&R at 24-25. But the R&R then treats as fact that this Subpoena is different—and the primary reason it offers for *why* is that the Government says so: "Unlike in all those situations, the Government has decided to move forward" and insists that "it followed proper procedure and issued the subpoena in good faith." R&R at 24. The R&R references "support in the record" for the Government's assertions, R&R at 18 n.5, 24, but Mr. Cole has assembled an "extensive record" supporting his view that the Government's assertions are incorrect. R&R at 24; *see also* R&R at 21 (noting that Mr. Cole has identified "no fewer than thirty examples" of the current Administration's actions targeting the press).

The purpose of the Court's review is to subject the competing assertions to scrutiny based on evidence, and the need for that examination is particularly pressing where, as here, the surrounding circumstances create a strong inference of irregularity and the Government has thus far refused to disclose the extent of its investigation—including, as its regulations require it to inform Mr. Cole, whether it has sought information about him from third parties. *Cf. United States*

*v. Carey*, 816 F. Supp. 3d 129, 142–44 (D.D.C. Jan. 20, 2026) (noting that courts must weigh evidence on each side to determine whether prosecutors acted for improper reasons). Because the "underlying factual record is incomplete" on the Government's side, the R&R's decision to credit the Government's assertions "amounts to guesswork." *Wall v. Rasnick*, 42 F.4th 214, 222–23 (4th Cir. 2022) (vacating and remanding with instructions to district court where "factual and legal issues essential to a reasoned . . . analysis were left unresolved by the magistrate judge and district court").

Mr. Cole respectfully submits that this Court has an obligation to do more where, as here, the Subpoena raises "legitimate concern" about the Administration's conduct and the Government and R&R fail adequately to address compliance with Department regulations. R&R at 16–20, 24. Against the backdrop of the vehement disapproval of the publication in which Mr. Cole's article appeared and the President's stated desire to jail reporters, the Magistrate Judge should have, at a minimum, held an evidentiary hearing, required a submission from the Government substantiating its assertions, heard oral argument, and conducted an appropriate review of the investigative steps taken to date to determine if internal Department regulations were followed and whether impermissible considerations drove the decision to launch this Subpoena. *Cf. United States v. White*, 366 F.3d 291, 302–03 (4th Cir. 2004) (remanding question for evidentiary hearing where the "facts as to this all-important matter [were] hotly disputed" and noting that "unsworn statements in memoranda filed by Government counsel do not constitute evidence.").

## CONCLUSION

The Court should set aside the Report and Recommendation and grant the Motion to Quash or, in the alternative, conduct further proceedings to develop an appropriate record.

Dated: August 14, 2026

Respectfully submitted,

*<u>/s/ Andrew Bosse</u>*
Andrew Bosse (VSB No. 98616)
abosse@bkbfirm.com
BAUGHMAN KROUP BOSSE PLLC
500 East Main Street, Suite 1400
Norfolk, Virginia 23510
Tel: (757) 904-5373

David A. O'Neil*
daoneil@debevoise.com
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave NW
Washington, DC 20004
Tel: (202) 383-8000

*Counsel for Movant Matthew Cole*
*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on August 14, 2026, I sent a true and correct copy of the foregoing to counsel for the Government in the United States Attorney's Office for the Eastern District of Virginia and the National Security Division of the Department of Justice by electronic mail.

/s/ Andrew Bosse
Andrew Bosse (VSB No. 98616)
abosse@bkbfirm.com
BAUGHMAN KROUP BOSSE PLLC
500 East Main Street, Suite 1400
Norfolk, Virginia 23510
Tel.: (757) 904-5373

*Counsel for Movant Matthew Cole*